[Civ. No. 471. Fourth Appellate District.—October 29, 1931.]

UNITED STATES OF MEXICO, Appellant, **v.** PETER RASK, Respondent.

Frank H. Heskett for Appellant.

Sawyer & Cluff and Ward, Ward & Ward for Respondent.

Stearns, Luce & Forward, *Amicus Curiae* on Behalf of Appellant.

MARKS, J.—This is an action in claim and delivery brought by the United States of Mexico to recover the possession of one of its patrol boats from Peter Rask. A bond was given by appellant and the boat delivered to it. Respondent answered and alleged that he was a shipwright and that the boat was brought to him as such by appellant for a general overhauling and repair; that he furnished labor and materials in performing this work and was entitled to a lien upon the vessel and its possession until his account was paid.

The facts are undisputed and may be briefly summarized from the findings of fact as follows: That appellant has been and is now a sovereign, independent and friendly nation, recognized as such by the United States of America, and was, and now is the owner of the oil screw patrol boat "S. A. F. No. 2", formerly known as the "Tecate", subject to a special interest of respondent therein. For several years prior to June 12, 1929, this vessel was owned and used by appellant in its sovereign capacity for the purpose of advancing the trade of its people, providing revenues for its treasury, and as a patrol boat on and along the Pacific Coast of Mexico in connection with and incident to the protection and enforcement of its customs and revenue laws.

Respondent was a boat builder and repairer and conducted a yard for the construction and repair of boats at San Diego, California. On June 12, 1929, appellant, through its duly authorized agent and officer, J. L. Sepulveda, fish and game commissioner for the Pacific Coast of Mexico, delivered the "S. A. F. No. 2" to respondent at San Diego for the purpose of having repairs made to it. Sepulveda was authorized by appellant and had authority to deliver the boat to respondent for the purpose of repair, and to contract for such repairs, and respondent, under the terms of a contract

with Sepulveda made repairs to the boat. After the repair of the patrol boat, a controversy arose as to the value of the labor and materials furnished and as to the balance due to respondent. The parties were unable to agree upon this balance and appellant demanded possession of the boat from respondent who refused to surrender the same unless and until the amount of his claim for repairs was paid.

The reasonable value of the labor and materials so furnished in the repair of the patrol boat was the sum of $17,811.61, upon which $4,850 had been paid, leaving the sum of $12,961.61 due, owing and unpaid to respondent.

From June 12, 1929, to October 31, 1929, respondent was in exclusive possession of the patrol boat. On October 31, 1929, the sheriff of the county of San Diego, pursuant to appellant's claim of delivery in this action, took possession of the patrol boat from respondent and delivered it to appellant, and appellant ever since has been in possession thereof and has continuously used it as an instrument of its sovereignty. By reason of the taking of the patrol boat from the possession of respondent, and the retention thereof, respondent has been damaged in the sum of $463.62, being interest on the amount and value of his special interest therein.

It was the conclusion of the trial court that at the time of the commencement of this action respondent had, and now has, a lien upon and a special interest in the patrol boat to the extent of the unpaid balance for the repairs in the sum of $12,961.61, by virtue of which he was and now is entitled to hold it in his possession. Judgment was entered directing the return of the patrol boat to respondent, or if return could not be had, that he recover from appellant the sum of $13,424.23, and costs. The bond was ordered delivered to respondent. Appellant is here on appeal from this judgment.

After appellant had concluded its case, and rested, its attorneys filed the following in the court below:

"The plaintiff at this time most respectfully objects to the jurisdiction of this court and the exercise of such jurisdiction as to or in regard to the claim interposed in this action by the defendant in his answer and amended answer filed herein to the plaintiff's complaint and to the plaintiff's amended complaint, both as to the alleged existence of a

lien upon the boat in question and to his claim or asserted claim against the plaintiff for repairs to said patrol boat, as set forth in the defendant's answer and his amended answer filed herein, or otherwise; and in this connection most respectfully asserts and claims immunity and exemption from such claims and all and every subject and matter set forth in said answer and said amended answer, so far as this action is concerned, and so far as the jurisdiction of this court is concerned relative thereto, or in any connection therewith, and as to each and every subject connected therewith.

"The plaintiff further most respectfully states and represents to the court that it came into this court for the sole and exclusive purpose of obtaining possession of said patrol boat and for no other purpose whatsoever, and has not and does not consent to this court entertaining jurisdiction as to any other controversy between the plaintiff and defendant, or as to any claim or claims of any character whatsoever which the defendant has inserted in his answer or amended answer filed herein; that this court has no jurisdiction, over the plaintiff's objection as herein asserted or otherwise, to entertain or assume or to exercise jurisdiction over the subject matter or any part thereof set forth in the defendant's answer or his amended answer, and that the plaintiff is immune and exempt from the jurisdiction of this court or the exercise thereof relative thereto.

"That plaintiff further most respectfully asserts and states to the court that because of the denials in the defendant's answer and amended answer these objections and claims could not be appropriately asserted prior hereto, but are now appropriate and timely in view of the stipulation between the plaintiff and defendant just now filed herein.

"FRANK H. HESKETT,
"WEINBERGER & MILLER,
"Attorneys for Plaintiff."

In addition to this written objection, counsel for appellant orally objected to the trial court taking or receiving any evidence in support of the lien upon the patrol boat asserted by respondent. These objections were overruled and the trial court proceeded with the case.

The briefs filed by respective counsel are able and exhaustive. The attorney for appellant relies upon a single

ground for a reversal of the judgment which he states as follows: "It is the appellant's contention that by virtue of it being a sovereign nation on friendly terms with the United States of America and having brought said boat into an American port as one of its instruments of sovereignty, that said boat was *exempt from the jurisdiction of this country;* that none of the laws of this country were applicable to the appellant or its said boat, under the circumstances."

*Amicus curiae,* who admittedly represents the Independence Indemnity Company, which furnished the undertaking upon which the patrol boat was released to appellant, is more resourceful. In addition to the ground relied upon by appellant, which is presented in several different forms, it is urged that the written and oral objections made by counsel for appellant were a claim of sovereign immunity which divested the trial court of jurisdiction to entertain the defense of a lien on the vessel by respondent and a bar to the rendition of an affirmative judgment against appellant; that even though respondent was entitled to a lien upon the boat, he was not entitled to possession of it because the lien, if any, was maritime under the federal laws, or floating under the provisions of section 813 et seq. of the Code of Civil Procedure, assuming such sections to be constitutional; that the courts of California have no jurisdiction in this action as the only forum competent to consider the lien of respondent, if any, is the admiralty court of the United States; that if the state courts have any jurisdiction over liens of the nature here presented it must be under the provisions of section 813 et seq. of the Code of Civil Procedure; that if these sections be held constitutional they furnish an exclusive right and remedy, superseding any other statutory or a common-law lien or suit to enforce them.

The questions presented to us have not been decided by the courts of California and we must look to other jurisdictions for legal precedent to guide us in our decision. A most comprehensive review of the decisions of the courts of the maritime nations of the world is contained in a report to the League of Nations in 1927 by the committee of experts for the codification of international law, which committee was composed of M. Matsuda and professors Diena and De Vesscher. Further extended discussion of many of these

authorities may be found in 22 Journal of International Law, 566.

Appellant, but not *amicus curiae,* confidently rests its case upon the decisions of the Supreme Court of the United States in the cases of *The Schooner Exchange* v. *M'Faddon,* 7 Cranch, 116 [3 L. Ed. 287], and *Berizzi Bros. Co.* v. *The Pesaro,* 271 U. S. 562, 70 L. Ed. 1088, 46 Sup. Ct. Rep. 611.

In the case of *The Schooner Exchange, supra,* it appears that on August 24, 1811, John M'Faddon and others filed their libel in the District Court of the United States for the district of Pennsylvania, against "The Schooner Exchange," alleging that they were her sole owners on the twenty-seventh day of October, 1809; that on December 30, 1810, while she was peacefully and lawfully pursuing a voyage from Baltimore to St. Sebastians in Spain, she was violently and forcibly taken by persons acting under the orders of The First Napoleon, Emperor of the French, and returned to the United States fitted as a vessel of war and manned by a crew of the French Empire. On September 20, 1811, the attorney of the United States for the district of Pennsylvania, appearing for the department of justice at the instance and request of the executive department of the United States government, suggested to the court that a state of peace and amity existed between the United States of America and Napoleon, the Emperor of the French, that the vessel libeled was a public war vessel belonging to and in the possession of Napoleon and therefore was not subject to seizure, arrest, detention, or molestation. The Supreme Court of the United States, in an opinion written by Mr. Chief Justice Marshall upheld the protest, discharged the libel and freed the vessel from restraint, and said: "To the court, it appears, that where, without treaty, the ports of the nation are open to the private and public ships of a friendly power, whose subjects have also liberty without special license, to enter the country for business or amusement, a clear distinction is to be drawn between the rights accorded to private individuals or private trading vessels, and those accorded to public armed ships which constitute a part of the military force of the nation. The preceding reasoning has maintained the propositions that all exemptions from territorial jurisdiction must be derived from the consent of the sovereign of the territory; that this consent may

be implied or expressed; and that when implied, its extent must be regulated by the nature of the case, and the views under which the parties requiring and conceding it must be supposed to act. . . . It seems, then, to the court, to be a principle of public law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction.''

In the case of *The Pesaro, supra,* it appears that this steamship transported merchandise from Italy to New York. Berizzi Bros. Co. filed a libel *in rem* against her upon a claim for damages arising out of a failure to deliver goods consigned to them. The Italian ambassador to the United States appeared on behalf of the Italian government and set forth that the vessel was owned and possessed by that government and was operated by and in its service, and that therefore it was immune from process of the courts of the United States. This was the first case in which the doctrine established in the case of *The Schooner Exchange* was sought to be extended to vessels of a foreign government engaged in commerce. Mr. Justice Van Devanter delivered the opinion of the court in which it was said: ''The decision in The Exchange therefore cannot be taken as excluding merchant ships held and used by a government from the principles there announced. On the contrary, if such ships come within those principles, they must be held to have the same immunity as war ships, in the absence of a treaty or statute of the United States evincing a different purpose. No such treaty or statute had been brought to our attention. We think the principles are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people, or providing revenue for its treasury, a government acquires, mans, and operates ships in the carrying trade, they are public ships in the same sense that war ships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a naval force.''

The following cases support this rule of sovereign immunity and hold that neither a friendly foreign power nor our own government may be sued in a court of the United

States or one of the states without its consent, express or implied, and that an instrumentality of sovereignty owned and used as such may not be taken from its possession by judicial process without such consent. (*Oliver American Trading Co., Inc.*, v. *Government of the United States of Mexico*, 5 Fed. (2d) 659; *Wulfsohn* v. *Russian Socialist Federated Soviet Republic*, 234 N. Y. 372 [138 N. E. 24]; *Mason* v. *Intercolonial Railway of Canada*, 197 Mass. 349 [125 Am. St. Rep. 371, 14 Ann. Cas. 574, 16 L. R. A. (N..S.) 276, 83 N. E. 876]; *Biggs* v. *Light Boats,* 11 Allen (Mass.), 157; *United States ex rel. Cardashian* v. *Snyder*, 59 App. D. C. 387, 44 Fed. (2d) 895; *The Roseric*, 254 Fed. 154; *The Maipo*, 252 Fed. 627; *The Maipo*, 259 Fed. 367; *The Carlo Poma*, 259 Fed. 369; *The Santissima Trinidad*, 20 U. S. (7 Wheat.) 283 [5 L. Ed. 454]; *The Gul Djemal*, 264 U. S. 90 [68 L. Ed. 574, 44 Sup. Ct. Rep. 574].)

In England the rules governing the question of sovereign immunity were first laid down in the case of *The Parlement Belge*, L. R. 5 P. D. 197. The question presented was whether a vessel belonging to Belgium, and used by that government in carrying mail and transporting passengers and freight for hire, could be subjected to a libel *in rem* in the admiralty courts of Great Britain. The conclusion was reached that as the vessel was the public property of a friendly foreign sovereign and was in use by him for national purposes, it could not be subjected to the process of the English court without his consent. This ruling has been consistently followed without deviation in the British courts, both as to vessels of friendly foreign governments and vessels of the British Crown. (*Young* v. *Scotia*, (1903) App. Cas. 501; *The Jassy*, L. R. (1906) P. D. 270; *The Gagara*, L. R. (1919) P. D. 95; *The Porto Aleandre*, L. R. (1920) P. D. 30; *The Jupiter*, L. R. (1924) P. D. 236; *Wadsworth* v. *Queen of Spain*, 17 Q. B. 171; *Vavassuer* v. *Krupp*, L. R. Ch. Div. 351; *DeHaber* v. *Queen of Portugal*, 17 Q. B. 171.)

It should be observed that claims of exemption in the British courts were always made through the Crown where British owned ships were involved. The courts permitted a libel to be filed against a vessel of the Crown and a representative of the court would then ask the Admiralty for permission to proceed with the suit. If this were given, the

exemption of the sovereign was considered waived and the suit continued, otherwise it was abated.

A marked distinction between the doctrine of sovereign immunity as adopted in England and in the United States clearly appears from the decisions of the courts of the two countries. In England the exemption has been universally held to apply where the vessel was the property of a sovereign and in use as an instrument of sovereignty. In the United States the further condition must exist, except in direct actions against the government, that the vessel or property was not only the property of and an instrumentality of sovereignty of the government, but that it was in its possession at the time of the seizure.

This question was considered in *United States* v. *Alexander M. Douglas* (*The Davis*), 10 Wall. (77 U. S.) 15 [19 L. Ed. 875], where it was said: ''Two questions are raised by the record in this case, both of which are of importance. The first is: whether personal property of the United States on board a vessel for transportation from one point to another, is subject to a lien for salvage services rendered in saving the property. The second is: under what circumstances, if any, can the lien be enforced, if one exists? . . . The second of the questions above stated presents the more difficult problem. Perhaps the two most authoritative and well considered cases on that subject are *The Siren*, 7 Wall. 152 [19 L. Ed. 129], and *Briggs* v. *The Light Boats*, 11 arise: (1) It is Both these cases assert the doctrine, after a full review of the authorities, that such a lien cannot be enforced where, in order to do this successfully, it is necessary to bring a suit against the United States, because the doctrine is well established that no suit can be sustained in which the United States is made the original defendant, to be brought into court by process, without some act of Congress expressly authorizing it to be done. They also both assert the proposition that no suit *in rem* can be maintained against the property of the United States when it would be necessary to take such property out of the possession of the government by any writ or process of the court.''

In the *Johnson Lighterage Co. No.* 24, 231 Fed. 365, 368, it was said: ''I therefore conclude that the property in question, although it belonged to the Russian government and was destined to its public use, was subject to a lien for

salvage services rendered in saving it, and that as it was not at that time, or at the time of its seizure by the marshal, in the actual possession of an officer of the Russian government, the lien may be enforced in this court by a proceeding *in rem."*

In *The Carlo Poma,* 259 Fed. 369, the same rule was announced, as follows: ''We are concerned in this case only with property of a foreign sovereign. The appellant contends that a vessel of a foreign sovereign not being a war vessel or at the time performing public duties but engaged in carrying cargo commercially is not entitled to immunity from suit. The English courts go the whole way in refusing process against property of a foreign sovereign under any circumstances. This because of the international comity due from one sovereign to another. *The Parlement Belge,* Law Reports, 5 P. D. 197; *The Jassy,* L. R. [1906] P. D. 270. The law of the United States is·the same, except that the immunity of property of a sovereign, whether the United States or a foreign sovereign, depends, not merely upon the ownership, but also upon the actual possession by the sovereign of the property at the time process is served. (*The Davis,* 10 Wall. (U. S.) 15 [19 L. Ed. 875] ; *Long* v. *The Tampico,* (D. C.) 16 Fed. 491; *The Attualita,* 238 Fed. 909 [152 C. C. A. 43].) ''

The following cases support this doctrine which is now so well established that it is not open to question. (*Long* v. *The Tampico,* 16 Fed. 491; *United States* v. *Wilder,* 3 Sumn. 308, 1 L. R. 189, Case No. 16,694, 28 Fed. Cas. 601; *Union Pac. R. R. Co.* v. *United States of America,* 2 Wyo. 170; *The Siren,* 7 Wall. 152 [19 L. Ed. 129].)

It is strongly urged upon us that the written objections which we have quoted, filed by counsel for appellant, and the oral objections made by them to the introduction of any evidence in support of respondent's special defense of ·a lien upon the patrol boat, divested the court below of any jurisdiction to proceed with the case in so far as these defenses are concerned. Counsel for appellant takes the position that they could invoke the jurisdiction of a state court to recover possession of the patrol boat and restore it to the United States of Mexico and thereafter by a plea of sovereign immunity and at their own pleasure divest the court of jurisdiction to hear the defense, and at the same time retain

the fruits of the action, possession of the patrol boat, without a trial of the real issues of the case. He virtually contends that a friendly foreign sovereign can walk in the doors of our courts and by the process of our laws take what it desires, walk out of the doors at will and close them upon any further consideration of the case and any adjudication of the rights of the sovereign and the citizen of this country whom the sovereign has named as its adversary.

Appellant relies upon *Beers* v. *Arkansas,* 20 How. 527 [15 L. Ed. 991], *Dexter & Carpenter* v. *Kunlig Jarnvagsstyrelsen,* 43 Fed. (2d) 705, and *Kingdom of Roumania* v. *Guaranty Trust Co.,* 250 Fed. 341 [Ann. Cas. 1918E, 524], in support of its contention that it may invoke the doctrine of sovereign immunity at any stage of the litigation and thereby shut off the defense of respondent.

The case of *Beers* v. *Arkansas, supra,* involved the question of the right of a state to establish or change rules of procedure under which an individual might sue it in its own courts. The opinion of the court was delivered by Mr. Chief Justice Taney in 1858. The Constitution of Arkansas provided that its general assembly should direct by law in what manner and in what courts suits may be commenced against the state. Under this authority the general assembly of Arkansas provided that suits might be instituted against the state to collect upon certain of its bonds. After the action had been instituted, and on December 7, 1854, a bill was passed providing that in such suits, before any judgment or decree could be entered, the bonds sued upon should be produced and filed in the office of the clerk of the court and not withdrawn until final determination of the suit and payment of the bonds, and that any suit should be dismissed in which such deposit was not made before the first term of court after the commencement of the action. The plaintiffs refused to deposit the bonds with the clerk and their action was dismissed. This judgment was affirmed in the Supreme Court of the state and a writ of error brought in the Supreme Court of the United States where the judgment of the state court was upheld. The act of the legislature of Arkansas, of December 7, 1854, merely changed certain rules of court procedure in a pending case. The right of a legislature so to do affecting pending litigation between individuals has never been seriously doubted and furnishes

sufficient reason for the conclusions reached in the Beers case. This case differs from the one we are considering as Arkansas had not submitted herself to the jurisdiction of her courts by bringing an action therein and the question of jurisdiction under such circumstances was not involved in the case nor considered by the court.

The case of *Dexter & Carpenter* v. *Kunlig Jarnvagsstyrelsen, supra,* must be considered with other cases involving the same issues between the same and additional parties. In the case relied upon by appellant (*Dexter & Carpenter* v. *Kunlig Jarnvagsstyrelsen, supra*), an action was brought in the District Court of the United States for the southern district of New York against Dexter & Carpenter, Incorporated, for breach of contract. Dexter & Carpenter sought affirmative relief upon a counterclaim. At the first trial, judgment went against Kunlig Jarnvagsstyrelsen on its complaint, and against Dexter & Carpenter upon the counterclaim. This judgment was reversed. (*Kunlig Jarnvagsstyrelsen* v. *National City Bank of New York* and *Dexter & Carpenter,* 20 Fed. (2d) 307.) Before a second trial was had the plaintiff filed a reply to the counterclaim in which it was specially alleged that it was an agency of the Swedish government and that the counterclaim could not be maintained against a sovereign government without its consent. This special defense to the counterclaim was stricken out, the District Court being of the opinion that where a sovereign government or one of its agencies files an action in the United States courts it submits itself to the jurisdiction of the courts which includes the jurisdiction to entertain and dispose of affirmative relief against such sovereign or its agency by way of counterclaim. (*Kunlig Jarnvagsstyrelsen* v. *Dexter & Carpenter,* 300 Fed. 891.) A second special claim of sovereign immunity against the counterclaim of Dexter & Carpenter was filed and was also stricken out by the United States District Court. This ruling was one of the issues presented on the appeal of the case to the United States Circuit Court (32 Fed. (2d) 195) which upheld the ruling of the District Court in striking the special defense principally upon the ground of the lack of authority on the part of counsel to make a claim of sovereign immunity.

Kunlig Jarnvagsstyrelsen petitioned the Supreme Court of the United States for a writ of *certiorari* directed to the

United States Circuit Court to review this decision. This petition was denied. (*Kunlig Jarnvagsstyrelsen* v. *Dexter & Carpenter*, 280 U. S. 579 [74 L. Ed. 629, 50 Sup. Ct. Rep. 32].)

The case was again before the United States District Court of Appeal (*Dexter & Carpenter* v. *Kunlig Jarnvagsstyrelsen*, 43 Fed. (2d) 705), which is the decision relied upon by appellant. It there appears that Kunlig Jarnvagsstyrelsen was also known as the Royal Administration of the Swedish State Railways, which were owned by the Crown and were admittedly property of the sovereign used in a governmental capacity. Judgment in the United States District Court had been rendered against Kunlig Jarnvagsstyrelsen upon the counterclaim of Dexter & Carpenter. One of the questions presented on appeal was whether or not it could claim sovereign immunity in an action brought by it. The United States Circuit Court adhered to its prior decision that there was a valid unsatisfied judgment against Kunlig Jarnvagsstyrelsen on the counterclaim of Dexter & Carpenter.

The main question considered in this decision (43 Fed. (2d) 705) was whether or not Dexter & Carpenter, as the successful litigants could levy an execution upon money belonging to the Swedish government in the National City Bank of New York, and also against the debts owing to the Swedish government by private corporations. After a careful review of authorities upon this question, the court held that although the Swedish government submitted to the jurisdiction of the United States courts and that a valid judgment could be rendered against it in an action which it had instituted, it had not thereby consented that other property belonging to it could be taken upon execution issued on the judgment. The effect of the decision is to hold that the bringing of an action by a friendly foreign sovereign, or its agency, in courts of the United States is a consent by such government or its agency to the rendition of a judgment against it, but not a consent to a levy upon its property within the United States and the taking of such property in satisfaction of the judgment.

Were the respondent in the instant case seeking to take the "S. A. F. No. 2" from the possession of the Mexican government on an execution issued on his judgment in the court below, then the case of *Dexter & Carpenter* v. *Kunlig*

*Jarnvagsstyrelsen, supra,* might be authority for holding that such possession could not be had. No such question is presented to us and we need not consider it.

In the case of *Kingdom of Roumania* v. *Guaranty Trust Co., supra,* Morris Arditti commenced an action in the Supreme Court of the State of New York against the Guaranty Trust Company and the Kingdom of Roumania, seeking to recover damages against the latter for breach of contract and to establish a lien upon the trust funds belonging to it in the possession of the other defendant. Before the Kingdom of Roumania had been served with process, it brought suit in the District Court of the United States for the southern district of New York, against the Guaranty Trust Company to recover the balance of its deposits with that company. The Guaranty Trust Company secured an order to pay the amount of the deposit into court and substituting Arditti as defendant in its place. An appeal from this order was taken to the United States Circuit Court, where it was held that while the Kingdom of Roumania had subjected itself to the jurisdiction of the United States District Court in its action to recover its deposit from the Guaranty Trust Company, such procedure on its part could not be held to be a consent to a substitution of defendants, and litigation of a cause of action against it separate and distinguished from and not connected with its original cause of action. This case was distinguished from the cases elsewhere cited in this opinion, which hold that where a sovereign brings an action in court, it submits to the jurisdiction of the court and in a proper case to affirmative relief against it. The court said: "In the present case there is no specific fund. The relation between the Kingdom of Roumania and the Guaranty Trust Company being the usual one of debtor and creditor existing between banks and depositors, we are clear that the action by the Kingdom of Roumania to recover a debt owed it by the Guaranty Trust Company was not a waiver of its immunity as a sovereign to be sued by other parties."

It has been repeatedly held that where our own government or a foreign friendly power seeks redress in the courts of this country they waive the claim of sovereign immunity and subject themselves to the jurisdiction of the courts and impliedly consent to the granting of affirmative relief against

them within the demand or concerning the property in controversy.

In *The Siren*, 7 Wall. 152 [19 L. Ed. 129], it appears that the steamer "Siren" was captured in the harbor of Charleston, South Carolina, in February, 1865, while it was attempting to violate the blockade of that port by the government of the United States. A prize master and crew were placed aboard her and she was ordered to the port of Boston for adjudication. During the voyage she put into the port of New York for coal and in proceeding thence through the Hurlgate, ran into and sank the sloop "Harper." On her arrival at Boston a libel in prize was filed against her and she was condemned and sold. The proceeds of the sale were deposited with the Assistant Treasurer of the United States. The owners of the sloop "Harper" and of her cargo intervened in these proceedings, claiming to have a lien upon "The Siren" and her proceeds for the damages sustained by the collision, and praying that their claim might be allowed and paid out of the proceeds of the sale. The United States District Court held that the intervention could not be allowed and dismissed the petition from which order an appeal was taken to the Supreme Court of the United States. It was held that although the property of the United States, used by it in its governmental functions, was exempt from the process of the courts, "yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of set-offs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed *in rem*, they open to consideration all claims and equities in regard to the property libeled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property in controversy." (*United States* v. *Ringgold*, 8 Pet. 150 [8 L. Ed. 899] ; *United States* v. *Macdaniel*, 7 Pet. 16 [8 L. Ed. 587].) " . . . For the damages occasioned by collision of vessels at sea a claim is created against the vessel in fault, in favor of the injured party. This claim may be enforced in the admiralty by a proceeding *in rem*, except where the vessel is the property of the United States. In such case the claim exists equally as if the vessel belonged

to a private citizen, but for reasons of public policy, already stated, cannot be enforced by direct proceedings against the vessel. It stands, in that respect, like a claim against the government, incapable of enforcement without its consent, and unavailable for any purpose. . . . The inability to enforce the claim against the vessel is not inconsistent with its existence. . . . The authorities to which we have referred are sufficient to show that the existence of a claim, and even of a lien upon property, is not always dependent upon the ability of the holder to enforce it by legal proceedings. A claim or lien existing and continuing will be enforced by the courts whenever the property upon which it lies becomes subject to their jurisdiction and control. Then the rights and interests of all parties will be respected and maintained.''

The foregoing rules announced in *The Siren, supra,* have been consistently followed by the United States courts. (*The Sao Vicente,* 295 Fed. 829; *The Sao Vicente,* 260 U. S. 151 [67 L. Ed. 179, 43 Sup. Ct. Rep. 15] ; *The Gloria, The Thekla, The F. J. Luckenbach, Kingdom of Norway* v. *Federal Sugar Ref. Co.,* 286 Fed. 188; *The Nuestra Senora de Regla,* 108 U. S. 92 [27 L. Ed. 662, 2 Sup. Ct. Rep. 287] ; *The Jane Palmer,* 270 Fed. 609; *Union Pacific R. Co.* v. *United States, supra; United States* v. *Wilder, supra; United States* v. *Douglas, supra; People of Porto Rico* v. *Bonocio Ramos,* 232 U. S. 627 [58 L. Ed. 763, 34 Sup. Ct. Rep. 461].)

In *The Gloria, supra,* the court said: ''The principle of immunity of a sovereign state from suit without its consent has a long history in our law, yet there are many new and unsettled problems in regard to its application in modern law today. Precedent and logic, while important, afford no infallible guide to the correct solution of these. All the important interests involved must be carefully weighed and balanced. . . . A sovereign state, generally speaking, is not obliged to go into court; but, if it seeks the assistance of the court, it would seem to be in accord with the best principles of modern law that it should be obliged to submit to the jurisdiction of the court in respect of any set-off or counterclaim properly assertable as a defense in a similar suit between private litigants. Although, perhaps, the defendant should not be permitted to assert any counterclaim which would not be, in whole or in part, a defense to the action brought by the state, yet, if it is necessary to examine a

counterclaim for the purpose of determining whether there is a defense to the original action, it would seem inconsistent with the duty of a court of general jurisdiction to do complete justice for the court not to determine the whole nature and extent of the counterclaim, even though it involved incidentally a determination that a sovereign state was indebted or obligated to the defendant. There is no principle of public law exempting a sovereign state from its obligations under the law. It should not be assumed that a state desires to deny or evade its obligations. There may be sound reasons of public policy why a state should be immune from the harassment of litigation in forums and under conditions not agreeable to the state. But, once the state has chosen its forum, there seems little reason in law or policy why it should not be subject to the substantive requirements of law and justice.''

*People of Porto Rico* v. *Bonocio Ramos, supra,* was an action brought by Bonocio Ramos to eject Eduardo Wood from certain lands in Porto Rico. Porto Rico intervened in the action, claimed ownership in the lands and sought affirmative relief. It also pleaded that it had attributes of sovereignty which exempted it from suit that would prohibit the court from entering a judgment in favor of the plaintiff and against it. The court held as follows:

''But one contention is argued, that is, that the district court had no jurisdiction to entertain the suit against Porto Rico 'without its consent and against its active opposition.' *Porto Rico* v. *Rosaly y Castillo,* 227 U. S. 270 [57 L. Ed. 507, 33 Sup. Ct. Rep. 352], is cited to sustain the contention. It was said in that case that the government 'established in Porto Rico is of such a nature as to come within the general rule exempting a government sovereign in its attributes from suit without its consent.' This case, however, is not within the rule. In that case Porto Rico was a defendant in the first instance. In this case it voluntarily petitioned to be made a party, asserting rights to the property in controversy, and, against the opposition of the plaintiff (defendant in error), it was made a party defendant. And this action was not improvident. Its attorney-general took time to consider. He applied for and obtained a continuance of the case to determine the best course to secure the interests of the people of Porto Rico—whether to assert its rights in the then litiga-

tion, or attempt to keep them under the immunity of its sovereignty from attack. His decision had the support of substantial reasons. . . . But, whatever his reasons, he certainly asked for time, as we have seen, 'to enable him to ascertain if the people of Porto Rico should be made a party defendant' in the cause; and having been granted the time, he appeared again in the cause and represented to the court that Porto Rico was an interested party to the action, and the court, having heard the arguments of opposing counsel, ordered Porto Rico to be made a party, and directed plaintiff to amend his complaint in execution of the order. Porto Rico, therefore, through its attorney general, not only gave its consent to be a party to the cause, but invoked and obtained the ruling of the court against the resistance of the plaintiff to make it a party to the cause. The complaint having been amended as moved and directed, and nearly a year having elapsed, there came a change of view; but the immunity of sovereignty from suit without its consent cannot be carried so far as to permit it to reverse the action invoked by it, and to come in and go out of court at its will, the other party having no right of resistance to either step.''

The rule thus uniformly adopted in the United States is in complete accord with that prevailing in England. In *The Newsbattle*, 10 Prob. Div. 33, it appears that the Belgian government filed a libel against a privately owned British vessel for damages sustained by one of its ships used as an instrument of sovereignty, the damages resulting from a collision between two vessels. The British owners filed a cross-libel for damages against the Belgian ship and moved the court for a stay of proceedings until security was given by the Belgian government. The court of appeals was unanimous in holding that the original proceedings instituted by the Belgian government should be stayed until it gave security to answer the cross-action as it had voluntarily submitted itself to the jurisdiction of the English courts. In the opinion the following pertinent language was used: ''It seems to me that this case is clearly within the words of the act of Parliament. What is there to take it out of the section? It is said that this order ought not to have been made on a sovereign prince. There are some orders which ought not to be made on a sovereign prince, but there are some which ought. In the case of *The Parlement Belge*,

*ubi supra,* the defendant, who was a sovereign, appeared under protest, and the question there raised was whether the admiralty court could seize a sovereign's ship carrying the insignia of sovereignty. It, however, has always been held that, if a sovereign comes into an English court as plaintiff, and avails himself of its procedure, the court may make all proper orders against him. How far that will go I do not know. In this case, the plaintiff having instituted his action in the English admiralty court, an order that he shall be restrained from proceeding until he gives security to answer the defendant's counterclaim is not in my opinion an order which touches his dignity. The court may very well do that within the comity of nations. The plaintiff has submitted himself to the jurisdiction of the court by instituting his action, and therefore the court says, 'We will not exercise our jurisdiction in your favor unless you give security.' What may be the result as to execution or seizing the ship afterwards is quite another thing. We, however, do not anticipate that if the judgment goes against the king of the Belgians he will not pay.''

It has been consistently held that a claim of sovereign immunity can only be made by a representative of the sovereign having authority to represent and speak for the sovereignty. (*The Schooner Exchange* v. *M'Faddon, supra; Berizzi Bros.* v. *The Pesaro, supra; Ex parte Muir,* 254 U. S. 522, [65 L. Ed. 383, 41 Sup. Ct. Rep. 185] ; *The Roseric,* 254 Fed. 154; *The Maipo,* 252 Fed. 627.)

It has been expressly held that a claim of sovereign immunity cannot be made by the master of a ship, a consul, or *a private attorney.* (*Lyders* v. *Lund,* 32 Fed. (2d) 308; *The Sao Vicente,* 260 U. S. 151 [67 L. Ed. 179, 43 Sup. Ct. Rep. 15] ; *The Sao Vicente,* 295 Fed. 829; *In re Muir, supra; The Anne,* 3 Wheat. 435 [4 L. Ed. 428] ; *The Gul Djemal,* 264 U. S. 90 [68 L. Ed. 574, 44 Sup. Ct. Rep. 244].)

In *Lyders* v. *Lund, supra,* it was said: ''The question then remains as to whether sovereign immunity is sufficiently claimed by the special appearance of Fin Lund as consul of Denmark, and his motion to dismiss. The Supreme Court of the United States has had occasion to discuss the proper channels through which such a claim may be made, where the foreign state is not a party to the suit, in a series of late cases. (Citing cases.) In *Ex parte Muir,* representa-

tions made on behalf of the British Embassy, by private counsel appearing as *amici curiae* to suggest the immunity of a steamship from libel as being a public vessel, were held insufficient as a claim of sovereign immunity. In *The Pesaro*, 255 U. S. 216 [65 L. Ed. 592, 41 Sup. Ct. Rep. 308], 'suggestions' by the Italian ambassador, not appearing formally in the suit, were rejected as an insufficient basis for recognizing a similar claim. The *Sao Vicente* expressly holds that the consul general of Brazil was not competent to claim sovereign immunity on behalf of a seized vessel. A special appearance by the master of the Turkish ship Gul Djemal, setting up the fact that his vessel, which had been libeled, was a public vessel of Turkey, was not a valid claim of immunity. It was only in the last case, *Berizzi Bros. Co.* v. *The Pesaro, supra,* that a claim of sovereign immunity was sustained. In that case the claim was by the Italian ambassador, who appeared in the suit; and, on behalf of his government, set forth the public character of a vessel which had been taken under process of the United States District Court. In *Ex parte Muir*, 254 U. S. 522, 532 [65 L. Ed. 383, 41 Sup. Ct. Rep. 185, 187], the Supreme Court points out the methods by which claims of sovereign immunity may be made: 'As of right the British government was entitled to appear in the suit, to propound its claim to the vessel and to raise the jurisdictional question. (*The Sapphire,* 11 Wall. 164, 167 [20 L. Ed. 127]; *The Santissima Trinidad,* 7 Wheat. 283, 353 [5 L. Ed. 454]; *Colombia* v. *Cauca Co.,* 190 U. S. 524 [47 L. Ed. 1159, 23 Sup. Ct. Rep. 704].) Or, with its sanction, its accredited and recognized representative might have appeared and have taken the same steps in its interest. (*The Anne, supra,* at pp. 445, 446.) And, if there was objection to appearing as a suitor in a foreign court, it was open to that government to make the asserted public status and immunity of the vessel the subject of diplomatic representations to the end that, if that claim was recognized by the Executive Department of this government, it might be set forth and supported in an appropriate suggestion to the court by the attorney-general, or some law officer acting under his direction. (Citing cases.)' And in *The Sao Vicente,* 260 U. S. 151, 155, [67 L. Ed. 179, 43 Sup. Ct. Rep. 15], in holding a foreign consul not to be clothed with authority to vindicate the prerogatives of the sovereign (of which

immunity from suit is one), the following passage from the opinion of Mr. Justice Story in *The Anne, supra,* at p. 445, is quoted with approval: 'And this brings us to the second question in the cause; and that is, whether it was competent for the Spanish consul, merely by virtue of his office, and without the special authority of his government, to interpose a claim in this case for the assertion of the violated rights of his sovereign? We are of opinion, that his office confers on him no such legal competency. A consul, though a public agent, is supposed to be clothed with authority only for commercial purposes. He has an undoubted right to interpose claims for the restitution of property belonging to the subjects of his own country; but he is not considered as a minister, or diplomatic agent of his sovereign, intrusted, by virtue of his office, with authority to represent him in his negotiations with foreign states, or to vindicate his prerogatives.''

We must now pass to the questions of (1) the jurisdiction of our state courts in this case, (2) whether or not respondent was entitled to the possession of the patrol boat by virtue of any lien for its repair, and, (3) whether section 813 et seq. of the Code of Civil Procedure furnish an exclusive remedy in cases involving the questions under consideration.

Section 2 of article III of the Constitution of the United States provides that the judicial powers of the federal government shall extend to all cases of admiralty and maritime jurisdiction to the exclusion of the state courts in actions strictly *in rem.* (*Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149 [11 A. L. R. 1145, 64 L. Ed. 834, 40 Sup. Ct. Rep. 438].) The maritime laws of the United States have always recognized the jurisdiction of the state courts in actions not strictly *in rem* or in admiralty, involving liens upon vessels where such lien existed under the common law. Obviously, the answer to the question of the jurisdiction of the state in this case is to be found in the answer to the question of whether or not a common-law lien existed in favor of a shipwright who furnished labor and materials used in the repair of a vessel.

In the case of *Pendergast* v. *The Kalorama,* 10 Wall. 204 [19 L. Ed. 941], the question of the common-law lien was considered by the Supreme Court of the United States. A

libel was filed upon the steamship Kalorama for repairs made and supplies furnished by the libellant. The United States District Court held in favor of the libellants, which judgment was reversed by the Circuit Court of Appeals. This judgment was reversed by the United States Supreme Court, which affirmed the judgment of the District Court. The court said: "By the civil law a lien upon the ship is given, without any express contract, to those who repair the vessel or furnish her with necessary supplies, whether the vessel was at her home port or abroad when the repairs and supplies were made and furnished. Dig. 14, 1; 1 Velin, Com. 363; 3 Kent, Com. 168; W. & B. Adm. PR. 155. But the only lien which the common law recognizes in such cases, independent of statutory regulations, is the possessory lien, which arises out of and is dependent upon the possession of the ship, as in cases where goods are delivered to an artisan or tradesman to be repaired or manufactured. Such a lien, as understood at common law, did not attach unless the ship was in the possession of the person who set up the claim, and the extent of the privilege which it conferred was that he might retain the ship in his possession until he was paid the money due him for the repairs made and the supplies furnished. Until paid he might refuse to surrender the ship, but if he relinquished the possession of the ship his lien was displaced and extinguished. (*Westerdell* v. *Dale,* 7 T. R. 312; *Justin* v. *Ballam,* 1 Salk. 34; *Walkinson* v. *Bernadiston,* 2 P. Wms. 367; 3 Kent. Com. 169; Maude & P. Ship. 64; *The Zodiac,* 1 Hagg. Adm. 320; *Spartali* v. *Benecke,* 10 C. B. 223."

That a common-law lien existed upon a vessel in favor of a shipwright who performed labor and furnished materials in its repair, which lien was dependent upon his possession of the boat, is well settled. It is also well settled that the shipwright does not need to surrender the possession of the vessel until his lien is satisfied by payment. (*The Marion,* Fed. Cas. No. 9087, 16 Fed. Cas. 751; *The F. B. Woolsey,* 7 Fed. 108; *The Edgar Baxter,* 37 Fed. 219; *The Ulrica,* 224 Fed. 140; *The John J. Freitus,* 252 Fed. 876; *The City of Miami,* 265 Fed. 427; *The General Smith,* 4 Wheat. 438 [4 L. Ed. 609].)

The question of concurrent jurisdiction of the federal and state courts in cases involving seagoing vessels was considered

in the case of *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109 [68 L. Ed. 582, 44 Sup. Ct. Rep. 274], where it was said: "By reason of the saving clause, state courts have jurisdiction *in personam*, concurrent with the admiralty courts, of all causes of action maritime in their nature arising under charter parties. Judiciary Act, Sept. 24, 1789, c. 20, sec. 9, 1 Stat. 73, 77; Judicial Code, sec. 24, par. 3. (Comp. St. sec. 991 [20 U. S. C. A., sec. 41]) ; *Leon* v. *Galceran,* 11 Wall. 185 [20 L. Ed. 74] ; *Schoonmaker* v. *Gilmore,* 102 U. S. 118 [26 L. Ed. 95] ; *Chappell* v. *Bradshaw,* 128 U. S. 132 [9 Sup. Ct. Rep. 40, 32 L. Ed. 369] ; *De Lovio* v. *Boit,* 2 Gall. 398, 475 [Fed. Cas. No. 3, 776].) The 'right of a common law remedy', so saved to suitors, does not, as has been held in cases which presently will be mentioned, include attempted changes by the states in the substantive admiralty law, but it does include all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved. It includes remedies *in pais,* as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law. (*Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, 644 et seq. 44 L. Ed. 921 [20 Sup. Ct. Rep. 824] ; *Rounds* v. *Cloverport Foundry & Machine Co.,* 237 U. S. 303 [59 L. Ed. 966, 35 Sup. Ct. Rep. 596].) A state may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction. (*The Hine* v. *Trevor,* 4 Wall. 555 [18 L. Ed. 451]; *The Glide,* 167 U. S. 606 [42 L. Ed. 296, 17 Sup. Ct. Rep. 930].) But otherwise the state, having concurrent jurisdiction, is free to adopt such remedies, and to attach to them such incidents, as it sees fit."

The entire question was again carefully considered by the Supreme Court of the United States in the case of *Knapp, Stout & Co.* v. *John McCaffrey,* 177 U. S. 638 [44 L. Ed. 921, 20 Sup. Ct. Rep. 824]. This case is decisive of the question we are now considering and is so well considered that quotations at length from it may be excused.

The following statement of facts appears:

"This was a bill in equity filed in the circuit court for the county of Mercer, Illinois, by the defendant in error, John McCaffrey, against the Knapp, Stout & Co. Company (hereinafter called the Knapp Company), and the Schulen-

burg & Boeckler Lumber Company (hereinafter called the Schulenburg Company), and its assignees, to enforce a lien for towage upon a half raft of lumber then lying at Boston Bay, in Mercer county. The suit arose from a contract made April 6, 1893, by McCaffrey with the Schulenburg Company, in which, after reciting that McCaffrey had purchased of this company three steam towboats for the sum of $17,500, it was agreed that McCaffrey was to tow all the rafted lumber such company would furnish him at or below their mill at Stillwater, Minnesota, to St. Louis, and deliver the same there to the company in quantities not exceeding one-half a raft at a time, for which service he was to be paid $1.12½ per thousand feet, board measure, for the lumber contained in the raft. The other provisions of the contract, of which there were many, were not material to the present controversy. After towing a number of rafts for the company, the charges for which remained unpaid, one of McCaffrey's steamers, known as the Robert Dodds, left Stillwater October 13, 1894, with raft No. 10 of that year. The river being low and navigation difficult, McCaffrey was instructed to divide the raft, to bring one-half to St. Louis and to lay up the other half in some safe harbor. In compliance with these instructions McCaffrey divided the raft on October 20 at Boston Bay harbor, in Mercer county, leaving one-half there, while the other half was towed to St. Louis and delivered to the lumber company on November 2. The company paid the clerk of the boat $1,250 without directions as to its application, and McCaffrey applied it on the amount due him for the towage of other rafts. The steamer returned to Boston Bay the morning of November 4, and laid up outside the raft for the winter. On the next day, November 5, the Schulenburg Company sold the half raft in Boston Bay to the Knapp Company for $15,000, part in cash and the remainder in a note due in four months, which was paid at maturity. A bill of sale was given for the lumber, and a letter written to the watchman in charge of the raft, informing him of the sale. On November 9 the Schulenburg Company made a voluntary assignment in St. Louis for the benefit of creditors. Mc-Caffrey, hearing of the assignment, offered both companies to tow the half raft to St. Louis under his contract, but the Knapp Company informed him that they did not wish

him to do so, saying that they did their own towing; whereupon McCaffrey, claiming to be still in possession of the half raft and believing that the company was about to take it from him by force, filed this bill to foreclose his lien for towage. The Knapp Company gave a bond for the amount of the claim and took the raft away. The case came on for hearing in the circuit court upon pleadings and proofs, and resulted in a decree dismissing the bill without prejudice. McCaffrey appealed to the appellate court, which reversed the decree of the circuit court and remanded the cause with directions to enter a decree for the sum of $3,643.17, with interest thereon. The Knapp Company appealed to the supreme court of the state, which affirmed the judgment of the appellate court (178 Ill. 107 [69 Am. St. Rep. 290, 52 N. E. 898]; whereupon defendant sued out a writ of error from this court.''

Under this statement of facts the Supreme Court of the United States held: ''Defendants set up in their answers and insisted, both before the appellate court and the supreme court of Illinois, that, if plaintiff had any lien upon the raft at all for his towage services, it was a maritime lien, enforceable only in the District Court of the United States as a court of admiralty. This is the only federal question presented in the case. By article 3, section 2, of the Constitution, the judicial power of the general government is declared to extend to 'all cases of admiralty and maritime jurisdiction'; and, by section 9 of the original Judiciary Act of 1789 (1 Stat. at L. 76, chap. 19), it was enacted 'that the district courts shall have, exclusively of the courts of the several states, . . . exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, . . . saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it'. This language is substantially repeated in subdivision 8 of Rev. Stat., section 563, wherein it is expressly stated that 'such jurisdiction shall be exclusive, except in the particular cases where jurisdiction of such causes and seizures is given to the circuit courts'. . . . To establish the proposition that the proceeding in this case was an invasion of the exclusive jurisdiction of the admiralty courts defendants are bound to show, first, that the contract to tow a raft is a maritime contract; second, that the proceeding taken was a suit *in rem* within the

cases above cited, and not within the exception of a common law remedy, which section 563 was never designed to forestall. The first of these conditions may be readily admitted. That a contract to tow another vessel is a maritime contract is too clear for argument, and there is no distinction in principle between a vessel and a raft. Whether the performance of such a contract gives rise to a lien upon the raft for the towage bill admits of more doubt; indeed, the authorities, as to how far a raft is within the jurisdiction of admiralty, are in hopeless confusion, but for the purposes of this case we may admit that such lien exists. But, if existing, it would not oust or supplant the common law lien dependent upon possession. The real question is whether the proceeding taken is within the exception of 'saving to suitors in all cases the right of a common law remedy, where the common law is competent to give it'. It was certainly not a common law action, but a suit in equity. But it will be noticed that the reservation is not of an *action* at common law, but of a common law *remedy;* and a remedy does not necessarily imply an action. A remedy is defined by Bouvier as 'the means employed to enforce a right, or redress an injury'. While, as stated by him, remedies for non-fulfillment of contracts are generally by action, they are by no means universally so. Thus, a landlord has at common law a remedy by distress for his rent—a right also given to him for the purpose of exacting compensation for damages resulting from the trespass of cattle. A bailee of property has a remedy for work done upon such property, or for expenses incurred in keeping it, by detention of possession. An innkeeper has a similar remedy upon the goods of his guests to the amount of his charges for their entertainment; and a carrier has a like lien upon the thing carried. There is also a common law remedy for nuisances by abatement; a right upon the part of a person assaulted to resist the assailant, even to his death; a right of recaption of goods stolen or unlawfully taken, and a public right against disturbers of the peace by compelling them to give sureties for their good behavior. All these remedies are independent of an action. Some of the cases already cited recognize the distinction between a common law action and a common law remedy. Thus, in *The Moses Taylor,* 4 Wall. 411, 431 [18

L. Ed. 397], *sub nom. The Moses Taylor* v. *Hammons,* [4 Wall. 411], 18 L. Ed. 397, 402, it is said of the saving clause of the Judiciary Act: 'It is not a remedy in the common law courts which is saved, but a common law remedy.' To same effect is *Moran* v. *Sturges,* 154 U. S. 256, 276 [38 L. Ed. 981, 987, 14 Sup. Ct. Rep. 1019]. In the case under consideration the remedy chosen by the plaintiff was the detention of the raft for his towage charges. That a carrier has a lien for his charges upon the thing carried, and may retain possession of such thing until such charges are paid, is too clear for argument. We know of no reason why this principle is not applicable to property towed as well as to property carried. While the duties of a tug to its tow are not the duties of a common carrier, it would seem that his remedy for his charges is the same, provided that the property towed be of a nature admitting of the retention of possession by the owner of the tug.''

It therefore conclusively appears that a common-law lien existed in favor of a shipwright who furnished labor and materials used in the repair of a vessel, which lien was dependent upon his possession of the ship. By section 3051 of the Civil Code this common-law lien has been written into the statute law of California. It therefore follows that the courts of California have jurisdiction in this case.

Counsel for appellant contends that the remedies given by section 813 et seq. of the Code of Civil Procedure for enforcing liens upon vessels for supplies and materials furnished and labor performed are exclusive and must be followed in the courts of this state, and that as this procedure is provided by statute, no other liens attach to the vessels and no other remedies exist. This was considered in the case of *Graham* v. *Annis,* 28 Cal. App. 754 [153 Pac. 981, 984], and was decided adversely to the contention of appellant. The court said: ''It is true that the law gives the lien, but it makes no provision for its enforcement other than by an action brought or attachment sued out as therein directed. As between the party who performs labor, or furnishes materials in the building or repair and the owner of the vessel, the lien and the right to enforce it continue for one year, but, unless fixed and determined by action brought, it is but a floating right; and we do not think the law relating to

vessels is or was intended to be exclusive of all remedies afforded for the enforcement of payment for the labor performed or materials furnished in the building or repair of such vessels. Plaintiff had a right of action independent of this special statute, and was not barred from availing himself of the general law relating to attachments on the assumption that the debt was 'secured by mortgage or lien upon real or personal property, or pledge of personal property'. The reasoning in *Porter* v. *Brooks,* 35 Cal. 199, seems to apply with controlling force to the case here.''

While we cannot assume that a friendly foreign nation will not satisfy a judgment against it, it may be that in so far as the actual parties in interest in this case before us, who can be reached by a judgment of our courts, are concerned, they are now limited to respondent and to the bonding company represented by *amicus curiae,* both residents of the United States. The situation thus presented is almost an exact replica of that in the case of *The Luigi,* 230 Fed. 493. A libel was filed against ''The Luigi'' and it was attached by the United States marshal. An attorney appeared as *amicus curiae* and suggested to the court that ''The Luigi'' was under requisition by the Italian government and was being used by it as an instrumentality of its sovereignty and therefore was exempt from attachments under the doctrine of sovereign immunity. This plea was overruled by the court on the ground of the lack of authority of the private counsel to make it. The master of the boat thereupon appeared on behalf of its owners and posted a bond to release the ship from the attachment. She was thereupon released and proceeded upon her way. Sovereign immunity was again claimed through the Department of Justice, this time in accordance with the established practice. The court said: ''As the case now stands, therefore, the court possesses authority only over the obligor's bond, and none over the vessel. Nothing remains, therefore, through which, directly or indirectly, the court can exercise or attempt to exercise any authority to implead the Italian government in this suit. After the release of The Luigi she was, as to this suit, as completely freed of any authority of this court as though she were upon her voyage across the Atlantic or lying at her dock in an Italian port. It was urged by Mr. Rawle at the

hearing that the court should take cognizance of the matter in the same manner as though these facts had come to its knowledge at the time the order for process was issued. The reasons which existed at that time for the application of the rule of comity, which would have moved the court to refuse the order for an attachment because of the universal consent to immunity of a sovereign state to being impleaded in a cause, no longer exists; and the suit from now on is between private individuals. I am unable to reach the conclusion that the rule of comity, notwithstanding its vast importance and unanimous recognition by the courts, should have retroactive effect and be applied where the necessity for its application no longer exists.''

The foregoing authorities make the following conclusions inevitable.

█ Sovereign immunity cannot avail the appellant here, because (1) the United States of Mexico submitted to the jurisdiction of the court below when it filed its action for the recovery of the patrol boat; (2) it could not divest the court below of jurisdiction to hear and determine the defenses interposed by respondent while it retained the fruits of its action; (3) the claim of sovereign immunity was made by private attorneys without a showing of any authority on their part to represent the sovereignty of appellant.

█ Appellant having waived its sovereign immunity, impliedly consented to the rendition of an affirmative judgment against it within the issues presented by its pleadings and affecting the subject matter of its action.

█ As a lien at common law existed in favor of a shipwright furnishing materials and labor used in the repair of a vessel dependent upon its possession, the state courts have jurisdiction in this case.

█ The common-law lien being written into the statute law of California, respondent had a right to retain the possession of the patrol boat until it was released by payment or by judicial process and the giving of a bond as provided by law.

█ The provisions of section 813 et seq. of the Code of Civil Procedure do not provide an exclusive remedy which respondent must follow in this case.

The trial court having found facts sufficient to support the lien of respondent, its judgment is supported by the findings and law of the land.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 24, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1931.