PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
06/30/99
THOMAS K. KAHN
CLERK

-----------------------
No. 95-5198
-----------------------

D. C. Docket Nos. 95-6313-CIV, 95-6314-CIV,
95-6315-CIV, 95-6316-CIV, 95-6317-CIV, 95-6318-CIV,
95-6319-CIV, 95-6320-CIV (consolidated)


AQUAMAR S.A.; EMELORSA-EMPACADORA
EL ORO; INDUSTRIAL Y AGRICOLA 44 S.A.,

Plaintiffs-Appellees,

versus


DEL MONTE FRESH PRODUCE N.A., INC.;
DEL MONTE FRESH PRODUCE COMPANY;
CIBA-GEIGY LIMITED,

Defendants-Appellants,

PROGRAMA NACIONAL DE BANANO,

Third-Party Defendants-Appellees.

-----------------------
Appeal from the United States District Court
for the Southern District of Florida
-----------------------

**(June 30, 1999)**

Before TJOFLAT and EDMONDSON, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

KRAVITCH, Senior Circuit Judge:

This appeal presents several novel issues regarding appellate jurisdiction and the waiver provisions of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-11. Defendants/appellants Del Monte Fresh Produce Company, Del Monte Fresh Produce N.A., Inc., and Ciba-Geigy Limited (collectively "appellants") contend that Programa Nacional de Banano ("PNB"), an Ecuadorian government agency, has expressly waived its sovereign immunity from suit under the FSIA. They appeal an order dismissing their third-, fourth- and fifth-party complaints against PNB[1] upon a finding that PNB enjoys sovereign immunity and remanding the cases to state court for lack of subject matter jurisdiction. Plaintiffs/appellees (collectively "plaintiffs") and third-party defendants/appellees PNB and the Republic of Ecuador contend that PNB's dismissal is not reviewable on appeal and that the district court correctly determined that PNB had not waived its sovereign immunity. Plaintiffs also have moved for attorneys' fees.

## I. BACKGROUND AND PROCEDURAL HISTORY

This action has made its way through the courts of three jurisdictions: the United States, the State of Florida, and the Republic of Ecuador. It originated in 1995

---

[1]Defendants filed six third-party complaints, one fourth-party complaint and one fifth-party complaint against PNB in eight actions, which the district court consolidated for pretrial purposes in May 1995.

when plaintiffs, commercial shrimp farmers in Ecuador, claimed in a series of Florida state court actions that fungicides and herbicides produced or supplied by the defendants and used on Ecuadorian banana farms had killed their shrimp. The defendants filed third-, fourth- and fifth-party complaints against PNB, a department within the Ministry of Agriculture and Livestock of the Republic of Ecuador, which removed the cases to federal court pursuant to 28 U.S.C. § 1441(d). The only basis for federal subject matter jurisdiction was PNB's presence under 28 U.S.C. § 1330(a), which gives the federal courts jurisdiction over foreign states and their agencies and instrumentalities. PNB then joined in defendants' motion to dismiss the actions on the grounds of forum non conveniens.

Plaintiffs moved to strike the complaints against PNB, arguing, among other things, that the district court did not have jurisdiction over PNB because PNB had sovereign immunity from suit under the FSIA.[2]  A flurry of communications ensued

_____

[2] A typical sovereign immunity inquiry pits a defendant attempting to claim immunity against a plaintiff who argues that an exception to immunity applies. These cases presented the district court with more unusual circumstances: the plaintiffs claimed that sovereign immunity existed, while representatives of the foreign sovereign defendant, PNB, claimed that it did not. On appeal, PNB now argues that it never waived sovereign immunity after all. This odd state of affairs may have resulted from Florida's evolving forum non conveniens jurisprudence. At the time of the alleged waivers, a federal court was far more likely than a Florida court to dismiss a case involving events taking place in a foreign country on forum non conveniens grounds. This difference between the federal and state systems disappeared in January 1996, when the Florida Supreme Court adopted the  federal courts' forum non conveniens analysis. See Kinney Sys., Inc. v. Continental Ins. Co., 674 So. 2d 86 (Fla. 1996) (adopting the approach announced in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S. Ct. 839 (1946)).

3

from Ecuadorian government officials and legal experts on whether PNB and the Ecuadorian government had, could, or were required to waive sovereign immunity. First, PNB's legal counsel filed documents on behalf of PNB that purported to waive PNB's sovereign immunity. PNB's May 4, 1995 Statement of Position stated that "PNB hereby, and for the purposes of this litigation and this litigation only . . . explicitly waives its immunity from the jurisdiction of this Court pursuant to 28 U.S.C. § 1605(a)(1)," but went on to say that the waiver did not apply to the government of Ecuador as a whole.[3] PNB later attempted to clarify its position, stating that

> The Republic of Ecuador, acting through its Ambassador to the United States and the undersigned counsel, ha[s] made it clear that any immunity from jurisdiction has been waived with respect to the allegations over the use of fungicides in Ecuador which have been made against PNB, and by extension against the Ministry and the Republic. . . . PNB hereby affirms that it is the intention of the Republic to waive sovereign immunity from jurisdiction with respect to the subject matter of this litigation.[4]

The district court initially denied plaintiffs' Motion to Strike, but reserved the right to reexamine the issue of PNB's sovereign immunity.

---

[3]R2-14 at 3, 4.

[4]May 23, 1995 Reply to Pls.' Mem. in Resp. to PNB's Statement of Position, R2-39 at 8.

On June 13, 1995, the District Court granted plaintiffs' Motions for Reconsideration, directing PNB to provide "convincing proof that the Republic of Ecuador has effected a valid waiver of its sovereign immunity for the purposes of the third, fourth and fifth-party complaints against PNB in these lawsuits."[5]

PNB then presented official documents purporting to waive immunity. The first, the June 16, 1995 affidavit of Edgar Terán, Ecuador's Ambassador to the United States, stated in part that

> I respectfully waive PNB's Sovereign Immunity on behalf of PNB and the Government of Ecuador on the following limited basis. Without waiving any other defense of law or fact to the claims asserted against it in this litigation, PNB hereby and for the purposes of these litigations only and in connection with the pending forum non conveniens motions (1) explicitly waives its immunity from the jurisdiction of this Court pursuant to 28 U.S.C. 1605(a)(i) and (2) consents to the exercise of personal jurisdiction by this Court over PNB.[6]

Terán stated that the purpose of the waiver was to support a federal court <u>forum non conveniens</u> dismissal:

> The decision by the Ecuadorian Government to submit to the Court's jurisdiction in connection with these cases was not made lightly but is a recognition of the fundamental seriousness with which the Ecuadorian Government defends its sovereignty over its environment and use of

---

[5]Order Upon Pls.' Mot. for Recons., and Directing Compliance with Provisional Consolidation Order, R3-59 at 2.

[6]R3-64 Attach., at 1, ¶ 1.

natural resources. . . . According to Ecuadorian law, conditions relating to the environment . . . belong to the sovereignty of each state.[7]

Plaintiffs questioned Ambassador Terán's authority to waive sovereign immunity. At a hearing on June 26, the district judge asked several questions about who, under international and Ecuadorian law, was authorized to waive a country's sovereign immunity. On June 27, 1995, the court entered another order directing the parties to supplement the record, stating that

> [g]iven the importance of this issue, the court has only one option. It must become informed of the relevant provisions of Ecuadoran law, determine precisely what is required for an effective waiver of sovereign immunity under that law, and examine the record to determine if there has been an effective waiver.[8]

PNB submitted an Ecuadorian legal expert's opinion that Ambassador Terán was authorized to waive sovereign immunity[9] and an affidavit of Sixto Durán Ballén, President of the Republic of Ecuador, stating that

> 3. Dr. Edgar Terán . . . has acted in the name of the Republic of Ecuador (and therefore of the National Banana Program).
>
> . . .
>
> 5. I . . . know what Ambassador Terán has already stated, and I ratif[]y his statement as regards the priority policy of the Republic of Ecuador

---

[7]Id., ¶ 4.

[8]Order Directing Parties to Supplement R., R4-74 at 1.

[9]See R4-87 Ex. B.

is that these matters . . . should be decided within the Ecuadoran forum . . . .[10]

In the meantime, plaintiffs submitted letters and affidavits of Ecuadorian legal experts and government officials claiming that (1) only the Attorney General of Ecuador was authorized to act in judicial matters, (2) the Ecuadorian Constitution did not allow anyone to waive Ecuador's sovereign immunity, and (3) Terán had improper motives for waiving sovereign immunity.

In an order dated August 28, 1995, the district court dismissed the complaints against PNB. The court found that PNB had not waived sovereign immunity because Ambassador Terán's affidavit was "expressly limited to litigation of the forum non conveniens motion now pending"[11] and President Durán Ballén's affidavit was "similarly qualified."[12] These qualifications meant that "[n]o representative of the Republic of Ecuador ha[d] ever purported to waive the immunity of the Republic with respect to the third, fourth and fifth-party claims against PNB."[13] In the same order, the district court remanded the cases to the state court on the ground that without PNB as a party, it no longer had subject matter jurisdiction over the action.

---

[10]Id. Ex. A, at 1 (emphasis omitted).

[11]Aug. 28, 1995 Order, R5-97 at 3.

[12]Id. at 4.

[13]Id.

7

The defendants filed a Motion for Reconsideration and for Stay and a Motion to Amend. PNB made one more attempt to waive sovereign immunity, filing an affidavit of Ambassador Terán dated August 31, 1995, which stated that

> 3. In its decision, the Court stated that "[n]o representative of the Republic of Ecuador has ever purported to waive the immunity of the Republic with respect to the third, fourth and fifth party claims against PNB."
>
> 4. I am surprised at the Court's conclusion because the waiver described by the Court . . . is precisely what I intended to effect in my prior affidavits. I hereby reaffirm that intention and that waiver.[14]

Plaintiffs, in response, submitted more evidence that Terán was not authorized to waive immunity. In an order dated October 12, 1995, the district court denied the defendants' motions. Citing 28 U.S.C. § 1447(d), it held that, because it had already remanded the cases, it was without jurisdiction to review its August 28 order.

Once the cases returned to Florida state court (with PNB no longer a party), the defendants again moved for a forum non conveniens dismissal. After the Florida trial court denied the motion, a Florida appeals court, relying on the recently decided case of Kinney Sys., Inc. v. Continental Ins. Co., 674 So. 2d 86 (Fla. 1996), found that the courts of Ecuador were an adequate alternative forum for the cases and directed the trial court to dismiss them on forum non conveniens grounds. See Ciba-Geigy Ltd.

---

[14]R5-99 Attach., at 1.

v. Fish Peddler, Inc., 691 So. 2d 1111 (Fla. Dist. Ct. App. 1997), review denied, 699 So. 2d 1372 (Fla. 1997). The trial court did so in October 1997. As the parties informed us at oral argument and in subsequent letter briefs, however, this may not be the end of the matter in the Florida courts. The Ecuadorian courts thus far have refused to accept jurisdiction over the cases; as a result, the Florida trial court has indicated that it may consider reinstating them.[15]

Appellants ask us to reverse the district court's August 28, 1995, dismissal of the complaints against PNB and to return the cases to federal court.

## II. APPELLATE JURISDICTION

Before addressing the question of whether PNB effectively waived sovereign immunity, we must determine whether we have jurisdiction to hear this appeal. We must address three questions: whether 28 U.S.C. § 1447(d) bars us from considering the appeal; whether the dismissal of the claims against PNB was a "final order" within the meaning of 28 U.S.C. § 1291; and whether the appeal is moot. We conclude that none of these considerations leaves us without jurisdiction.[16]

### A. Section 1447(d)'s Bar on Review of Remands

---

[15]See Appellants' Letter Br. dated Jan. 29, 1999 and Appellees' Letter Br. dated Feb. 1, 1999.

[16] Because we have jurisdiction over this appeal, plaintiffs' Motion for Attorneys' Fees and Costs is without merit.

Section 1447(d), which states that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise," generally bars a court of appeals from reviewing a district court's order of remand. See Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 342-43, 96 S. Ct. 584, 589 (1976); Florida Polk County v. Prison Health Servs., Inc., 170 F.3d 1081, 1083 (11th Cir. 1999); Glasser v. Amalgamated Workers Union Local 88, 806 F.2d 1539, 1540 (11th Cir. 1986).

Although section 1447(d) has exceptions that allow courts of appeals to review some orders of remand, none of them applies here. In Thermtron, 423 U.S. at 346, 96 S. Ct. at 590, for example, the Supreme Court held that section 1447(d) applies only to remands made on grounds authorized in 28 U.S.C. § 1447(c). Because section 1447(c) authorizes the ground for remand here, lack of jurisdiction, the Thermtron exception does not apply. Another doctrine, known as the "matter of substantive law exception," allows the courts of appeals to review those remands to state court that are based on determinations of the substantive rights of the parties. See Pelleport Investors, Inc. v. Budco Quality Theatres, Inc., 741 F.2d 273, 276-77 (9th Cir. 1984) (reviewing district court decision on enforceability of forum selection clause); Clorox Co. v. United States Dist. Court, 779 F.2d 517, 520 (9th Cir. 1985) (reviewing decision that defendant had waived right to remove case); see also Glasser, 806 F.2d

at 1540 ("[T]he 'matter of substantive law' exception . . . permits appellate review of a district court remand order only where that order is based solely on a matter of substantive law."). The "matter of substantive law exception" itself has an exception: It does not apply when "the substantive issue is intrinsic to the district court's decision to remand for lack of subject matter jurisdiction." Calderon v. Aerovias Nacionales, 929 F.2d 599, 602 (11th Cir. 1991); see also Glasser, 806 F.2d at 1540. Because the district court's order of remand in the cases before us did not resolve any substantive issues, the "matter of substantive law exception" does not allow us to review it.

Section 1447(d) does not prevent us from reviewing the district court's order dismissing the complaints against PNB, however, even though it was made at the same time as the order of remand, because of the limitation on section 1447(d) recognized in City of Waco v. United States Fidelity & Guar. Co., 293 U.S. 140, 143, 55 S. Ct. 6, 7 (1934). In Waco, the defendant in a state court action "vouched in" a third-party defendant, who removed the case to federal district court on the ground of diversity. Id. at 141, 55 S. Ct. at 6. The district court entered an order dismissing the third-party complaint and remanding the case to state court on the ground that as a result of the dismissal, diversity no longer existed. Because the district court order dismissed a claim before remanding the case to state court, and because the dismissal, by removing the third-party defendant from the state court action, would change the

11

shape of the lawsuit in a way that could not be reviewed on appeal in state court, the Supreme Court found that the dismissal (but not the remand) was reviewable on appeal.

> [I]f the District Court's order stands the cross-action will be no part of the case which is remanded to the state court. . . . True, no appeal lies from the order of remand; but in logic and in fact the decree of dismissal preceded that of remand and was made by the District Court while it had control of the cause. Indisputably this order is the subject of an appeal; and, if not reversed or set aside, is conclusive upon the petitioner.

Id. at 143, 55 S. Ct. at 7. The Waco doctrine allows us to review district court orders that lead to, but are separate from, orders of remand and have a conclusive effect upon the ensuing state court action. See, e.g., Beauclerc Lakes Condominium Ass'n v. City of Jacksonville, 115 F.3d 934, 935 (11th Cir. 1997) (reviewing dismissal of federal claim that led to remand); Armstrong v. Alabama Power Co., 667 F.2d 1385, 1387 (11th Cir. 1982) (relying on Waco to review district court's dismissal of United States as party prior to remand).

Unlike the "matter of substantive law exception" to section 1447(d), which allows courts of appeals to review only those remand orders that are based on substantive determinations of law, the Waco doctrine allows us to review a district court's jurisdictional determinations.[17] This distinction exists because the "matter of

---

[17]We suspect that the district court erroneously confused the Waco doctrine and the "matter of substantive law exception" when it stated that section 1447(d) precluded review of the order of dismissal because the order merely set the limits of federal court jurisdiction and did not

12

substantive law exception" and the Waco doctrine apply to different types of orders. The "matter of substantive law exception" applies to the review of a remand order itself, see Glasser, 806 F.2d at 1540 n.2; see also Regis Assocs. v. Rank Hotels (Management) Ltd., 894 F.2d 193, 194 (6th Cir. 1990), that determines the substantive issues of the case in a way that is conclusive because it is unreviewable by the state court. The reason that the "matter of substantive law exception" does not apply to a remand based on a district court's jurisdictional findings is that these findings have no conclusive effect upon the state court action. See In re Loudermilch, 158 F.3d 1143, 1146-47 (11th Cir. 1998); Angelides v. Baylor College of Med., 117 F.3d 833, 836-38 (5th Cir. 1997) (distinguishing pre-remand decisions, such as denials of immunity, that are not "'conclusive' because, as jurisdictional decisions, they may be reviewed in the state court" from decisions that are not reviewable in state court).

When a district court enters an order to do something other than remand (such as a dismissal of a claim or a party), and this order changes the contours of the state court action after remand, however, it does not matter whether the issue of law the court decided when it entered the order was jurisdictional or substantive; either way, the parties' rights have been altered in a manner that the state court cannot revisit. See Carr v. American Red Cross, 17 F.3d 671, 675 (3d Cir. 1994) (reviewing order of

---

"resolve independent substantive rights of the parties." Oct. 12, 1995 Order, R6-113 at 4.

13

dismissal of defendant that led to remand because "the underlying dismissal order clearly had independent relevance in adjudging the rights of [the] parties . . . . That is, the ramifications of the dismissal order impacted on more than the issue of federal subject matter jurisdiction alone.").

Here, the district court dismissed the claims against PNB "in logic and in fact" before remanding the case, Waco, 293 U.S. at 143, 55 S. Ct. at 7, and this dismissal, like the Waco dismissal, altered the contours of the remanded state court action. As a result of the dismissal, appellants could no longer pursue their claims against PNB. The fact that, if defendants had filed new complaints against PNB in state court, PNB might have been able to effect another waiver there is irrelevant to our inquiry: the matter on appeal is not whether PNB could have waived its sovereign immunity at some point,[18] but whether it did waive it before the district court in these cases.

B.    Finality

Having found that section 1447(d) does not bar our review, we must determine whether the district court's order was an appealable final order under 28 U.S.C. §

_____

[18] PNB now states that it intends to invoke sovereign immunity. If it did waive its sovereign immunity before the district court, however, that waiver remains effective: sovereign immunity, once waived, cannot be reasserted. See 28 U.S.C. § 1605(a)(1) (stating that a foreign state's immunity remains waived "notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver"); Restatement (Third) of the Foreign Relations Law of the United States § 456(3) (1986) ("Under the law of the United States, a waiver of immunity . . . may not be withdrawn, except by consent of all parties to whom (or for whose benefit or protection) the waiver was made.").

14

1291.  Under the collateral order doctrine of <u>Cohen v. Beneficial Indus. Loan Corp.</u>, 337 U.S. 541, 546, 69 S. Ct. 1221, 1225-26 (1949), we may review a decision that (1) conclusively determines a disputed question that is (2) important and completely separate from the merits of the action and is (3) effectively unreviewable on appeal from a final judgment.  <u>See</u> <u>Coopers & Lybrand v. Livesay</u>, 437 U.S. 463, 468, 98 S. Ct. 2454, 2458 (1978).  A dismissal of a claim or a party prior to remand is such an appealable collateral order, because "if not reversed or set aside it will remain conclusive upon the petitioner," <u>Katsaris v. United States</u>, 684 F.2d 758, 761 (11th Cir. 1982); <u>see also</u> <u>Carr</u>, 17 F.3d at 675-77 (holding that district court's order dismissing co-defendant prior to remand was final under section 1291).

C.    <u>Mootness</u>

Finally, we must refuse to hear this appeal if the issue is moot.  "A federal court has no authority to give opinions on moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  <u>John Roe, Inc. v. United States</u>, 142 F.3d 1416, 1421 (11th Cir. 1998) (quotation omitted).  A case is moot if "the parties lack a legally cognizable interest in the outcome." <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383 (1979) (quotation omitted).  Whether the parties here have a legally cognizable interest depends on what relief this court may grant:  if intervening events have made

15

it "impossible for [us] to grant any effectual relief whatever to [the] prevailing party," we must dismiss this appeal. John Roe, Inc., 142 F.3d at 1421 (quotation omitted). Thus, we must determine what relief we are authorized to grant if we find that the district court erred in dismissing PNB.

If the parties still were actively litigating these cases in the Florida court system, we could follow Waco's example and reverse the order of dismissal while leaving the remand order intact. See, e.g., Waco, 293 U.S. at 143-44, 55 S. Ct. at 7 ("[R]eversal [of the dismissal order] cannot affect the order of remand, but it will at least, if the dismissal of the petitioner's complaint was erroneous, remit the entire controversy, with the [erroneously dismissed third-party defendant] still a party, to the state court for such further proceedings as may be in accordance with law."); see also Allen v. Ferguson, 791 F.2d 611, 616 (7th Cir. 1986) (reversing district court's dismissal of defendant but stating that resulting "remand must remain undisturbed . . . . Because the dismissal is now a nullity, Ferguson remains a defendant in the action remanded to the Illinois state court.").

Because of the unusual procedural posture of the cases before us, however, unlike the Waco and Allen courts, we cannot correct the effects of an erroneous dismissal simply by reversing the order of dismissal. The remanded cases remain in an odd limbo, not quite in the Florida courts but not entirely out of them. Because of

16

a new statute that limits their jurisdiction, the Ecuadorian courts have dismissed most of plaintiffs' Ecuadorian actions; plaintiffs' pending appeals of these dismissals to higher courts in Ecuador appear to stand little chance of success. Although the Florida state court has indicated that it may consider reinstating the cases if the Ecuadorian courts continue to refuse to accept jurisdiction,[19] we do not know if or when such a reinstatement might take place. A reversal of the dismissal that does not alter the order of remand cannot change the status of the Florida state court cases. Thus, we are able to grant "effectual relief," John Roe, Inc., 142 F.3d at 1421 (quotation omitted)—and, therefore, the case is not moot—only if we are authorized to direct the district court to vacate its order of remand and return the case to federal court. We conclude that we are authorized to take this step.

Although, at first glance, vacatur of the remand order appears to contradict the instruction of section 1447(d), the language of the statute and precedent from this and other circuits convince us that section 1447(d) does not bar us from vacating a remand when necessary to give effect to our judgment on another matter. Vacatur of a remand order does not necessarily constitute a forbidden "review" of the remand decision. To "review" an order, a court must do more than merely cancel it; it must, to some extent,

---

[19] One of the reasons underlying the forum non conveniens dismissal of the case was the Florida appeals court's finding that Ecuador was an adequate alternative forum with jurisdiction over the cases. See Ciba-Geigy Ltd. v. Fish Peddler, Inc., 691 So. 2d 1111, 1115-17 (Fla. Dist. Ct. App. 1997), review denied, 699 So. 2d 1372 (Fla. 1997).

17

examine it and determine its merits. A "review" is a "reconsideration; second view or examination; revision; consideration for purposes of correction." Black's Law Dictionary 1186 (5th ed. 1979). A vacatur does not necessarily implicate this sort of examination. See, e.g., U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U.S. 18, 22-23, 115 S. Ct. 386, 390 (1994) (noting that "vacatur" may be available when "review" is precluded).

If we order the district court to vacate an order for reasons that do not involve a reconsideration or examination of its merits, then we have not "reviewed" the order, and therefore have not fallen afoul of section 1447(d)'s prohibition on review. The Fifth Circuit recently followed this reasoning. In Tramonte v. Chrysler Corp., 136 F.3d 1025 (5th Cir. 1998), after denying the appellant's motion to recuse, the district court judge had remanded the case to state court for lack of subject matter jurisdiction. The court of appeals remanded to the district court for further consideration of the motion to recuse and vacated the order of remand, holding that vacatur did not constitute a "review" banned by section 1447(d).

> [Section] 1447(d) intends to insulate from appellate review a district court's determinations as to its subject matter jurisdiction and compliance with remand procedures. . . . [W]e may reach and modify a remand order on appeal, so long as we do not engage in the review prohibited by § 1447(d).

18

Id. at 1027. "[V]acatur of the remand order," the court held, was not "a review of the merits of that order," but "an essentially ministerial task." Id. at 1028. Similarly, vacating a remand to give effect to a judgment on another matter is an "essentially ministerial task," rather than a review.

This circuit has held that a court of appeals may vacate an order of remand when necessary to give effect to its judgments. In Flohr v. Mackovjak, 84 F.3d 386, 392 (11th Cir. 1996), this court reversed the district court's denial of the defendant's motion to substitute the United States as the party defendant in a negligence action, a denial that led to remand to state court. The court then explained that "in the exercise of our inherent power to issue such orders as may be necessary to effectuate relief in cases properly brought before this court, we can direct the district court to vacate its order of remand." Id. at 392. We noted that "[s]uch a directive would not constitute a review of the order of remand in violation of 28 U.S.C. § 1447(d), but rather a valid exercise of our power, if not our duty, to effectuate the relief granted to the appellant by today's decision and avoid rendering an advisory opinion." Id. at 392 n.9.[20] In another case, we considered a district court order dismissing the federal government's claim to an interpleaded fund and remanding the case to state court

___

[20]The court found it unnecessary to take this step, but stated that if the U.S. Attorney did not remove the case to district court on behalf of the United States, it would "entertain a petition for a writ of mandamus to require the district court to vacate its [remand]." Flohr, 84 F.3d at 392-93.

19

because the dismissal eradicated federal jurisdiction. After finding that the dismissal was improper, we vacated the order of remand and returned the case to the district court. See Katsaris, 684 F.2d at 763.

Other circuits similarly have undertaken a Waco review of a decision preceding a remand, then reversed or vacated the remand itself. See, e.g., Carr, 17 F.3d 671 (reversing order dismissing party and directing district court to vacate remand); Mitchell v. Carlson, 896 F.2d 128 (5th Cir. 1990) (considering resubstitution decision that preceded remand order, then ordering district court to dismiss case); Kozera v. Spirito, 723 F.2d 1003 (1st Cir. 1983) (reversing dismissal of third-party complaint and vacating remand order). In each of these cases, alteration of the remand order was necessary to give effect to a judgment that the order preceding the remand was error. See Beneficial Consumer Discount Co. v. Poltonowicz, 47 F.3d 91, 93 (3d Cir. 1995) (reviewing and affirming sovereign immunity decision that preceded remand, but stating that "§ 1447(d) bars our review of that portion of the district court's order remanding this case to state court;" noting that case before it was distinguishable from Carr "because without [Carr's] review [of the remand order], our decision overturning the district court's order which triggered the remand would have been meaningless").

Were any other option available to us, we would avoid meddling with the order of remand. Ordinarily, when we pull a remanded case back into the federal courts, we

delay the progress of justice and give parties a tool and an incentive to engage in dilatory tactics. See Thermtron, 423 U.S. at 354-57, 96 S. Ct. at 594-96 (Rehnquist, J., dissenting). In this action, however, should we decide that the district court erred in dismissing the claims against PNB, we have no choice but to vacate the remand. Because, as we have determined, we have the power to grant relief, this appeal is not moot.

### III. WAIVER OF SOVEREIGN IMMUNITY

Having established our jurisdiction, we proceed to the merits of the appeal. We hold that PNB waived its sovereign immunity and therefore is not immune from suit under the FSIA.

We review de novo the district court's determination that it lacked jurisdiction under the FSIA. See Honduras Aircraft Registry, Ltd. v. Government of Honduras, 129 F.3d 543, 546 (11th Cir. 1997), cert. denied, __ U.S. __, 118 S. Ct. 2368 (1998) (conducting de novo review of FSIA jurisdictional question); see also Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1469 (9th Cir. 1995) ("[T]he existence of subject matter jurisdiction under the FSIA is a question of law subject to de novo review."). We may set aside the district court's factual determinations, however, only if they are clearly erroneous. See Honduras Aircraft Registry, 129 F.3d at 546. Where a party (here, defendants) has asserted facts suggesting that an exception to foreign sovereign

immunity exists, the party arguing for immunity (in this action, plaintiffs[21]) bears the burden of proving by a preponderance of the evidence that the exception does not apply. See Stena Rederi AB v. Comision de Contratos, 923 F.2d 380, 390 n.14 (5th Cir. 1991); Joseph v. Office of the Consulate General, 830 F.2d 1018, 1021 (9th Cir. 1987).

As a threshold matter, we conclude that the district court correctly determined that it was required to address the issue of PNB's immunity, despite the fact that Ecuador did not raise the issue. Parties other than a foreign sovereign ordinarily lack standing to raise the defense of sovereign immunity. See Wilmington Trust v. United States Dist. Court, 934 F.2d 1026, 1033 (9th Cir. 1991) ("Congress intended requests for protection under the FSIA to originate from the foreign state party."); Republic of the Philippines v. Marcos, 806 F.2d 344, 360 (2d Cir. 1986). When the court's jurisdiction rests on the presence of the foreign sovereign, however, the court may address the issue independently. See Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 493 n.20, 103 S. Ct. 1962, 1971 n.20 (1983); see also Coleman v. Alcolac,

_____

[21]The courts rarely have had occasion to consider the proper allocation of the burden of proof when a party other than the foreign sovereign argues that the sovereign is immune from suit. But see Didi v. Destra Shipping Co., No. 93-1851, slip op. at 3 (E.D. La. June 17, 1993) (in case similar to this one, where defendant filed third-party claim against foreign sovereign, foreign sovereign did not claim sovereign immunity and original plaintiff raised issue, defendant was required only to "assert some facts that would establish the exceptions" to sovereign immunity to prevent remand to state court) (quotation omitted).

Inc., 888 F. Supp. 1388, 1400 (S.D. Tex. 1995) ("[T]he district court must address the issue of sovereign immunity, even if . . . the foreign state has not even entered an appearance to assert the immunity defense."). Because federal jurisdiction depended upon PNB's presence, the fact that plaintiffs, rather than PNB, raised the issue of sovereign immunity did not foreclose the district court's inquiry.

"The FSIA regulates subject matter jurisdiction and provides the only basis for courts in this country to acquire jurisdiction over a foreign state. It provides that a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." Honduras Aircraft Registry, 129 F.3d at 546; see also Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 1476-77 (1993). Because PNB is an agency of the Republic of Ecuador, we treat it as a foreign state for purposes of the FSIA. See 28 U.S.C. § 1603(a), (b). The only exception to the FSIA that is relevant to this appeal[22] is waiver of immunity under section 1605(a)(1), which provides that

---

[22]A commonly litigated exception to the FSIA, the commercial activity exception, does not apply here. This exception to sovereign immunity applies to lawsuits

> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). Although PNB's activities appear to have been "commercial" in nature, defendants do not claim that their effect within the United States was sufficient to bring them within section 1605(a)(2).

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver[.]

28 U.S.C. § 1605(a).

We must examine the communications from PNB's lawyers and Ambassador Terán[23] to determine if any of them constituted an express waiver[24] of immunity.

---

[23]President Durán Ballén's affidavit did not purport to effect a waiver; it merely confirmed Ambassador Terán's authority. See R4-87 Ex. A.

[24] PNB did not waive its immunity by implication. The House Report on the FSIA gives three examples of an implied waiver:

> [T]he courts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.

H.R. Rep. No. 94-1487, at 18 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617. The courts, loath to broaden the scope of the implied waiver provision, rarely have found that an action that does not fit one of the above three examples constitutes an implicit waiver. See Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir. 1991) ("Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly. . . . [The House Report's] examples involve circumstances in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous."). PNB never filed a responsive pleading, and its other participation in the litigation, such as removing the case to federal court, filing statements of position, and joining the forum non conveniens motion, did not constitute an implicit waiver. See Rodriguez v. Transnave Inc., 8 F.3d 284, 287-90 (5th Cir. 1993) (finding no implicit waiver of sovereign immunity where foreign state made "voluntary appearance" in lawsuit in which it had not formally been served, removed case to federal court, and participated in discovery and trial preparation for two years).

A.      Statements in PNB's May 1995 Court Documents

PNB filed two statements of its lawyers with the district court that purported to waive sovereign immunity.  Plaintiffs ask us to hold that these documents did not constitute valid waivers under section 1605(a)(1) because a document signed only by a private attorney never can serve to waive the immunity of the attorney's sovereign client.  Although we decline to adopt such a rule, we determine that, in this action, PNB's lawyers failed to effect a waiver of sovereign immunity on behalf of the Republic.

Congress, in enacting the FSIA, contemplated that a private attorney representing a foreign state could waive sovereign immunity implicitly by filing, on behalf of the state, a responsive pleading that did not raise the defense.  See H.R. Rep. No. 94-1487, at 18 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617; see also supra note 24.  It follows that Congress contemplated that a state's legal representative could use a different tool, an express waiver of the state's immunity from a legal proceeding, to accomplish the same goal.  This and other courts have given effect to private attorneys' express waivers of the sovereign immunity of their clients.  See Hercaire Int'l, Inc. v. Argentina, 821 F.2d 559, 561, 563 (11th Cir. 1987) (treating statement included in answer and counterclaim as an "express waiver"); Sotheby's, Inc. v. Garcia, 802 F. Supp. 1058, 1062-63 (S.D.N.Y. 1992) (finding that a memorandum of

25

law and affirmation of counsel validly expressly waived Republic of the Philippines' sovereign immunity); see also Rich v. Naviera Vacuba, S.A., 197 F. Supp. 710, 721-22 (E.D. Va.), aff'd, 295 F.2d 24 (4th Cir. 1961) (pre-FSIA case rejecting argument that attorney's waiver of a sovereign's immunity "must be supported by documentary evidence" and affording full faith and credit to judgment entered after an attorney waived a foreign state's immunity by entering a general appearance on behalf of the sovereign).[25]

Assuming that PNB's attorneys could waive sovereign immunity on behalf of Ecuador, they did not do so in the May 1995 statements. An express waiver under section 1605(a)(1) must give a "clear, complete, unambiguous, and unmistakable" manifestation of the sovereign's intent to waive its immunity. Aguinda v. Texaco, Inc., 175 F.R.D. 50, 52 (S.D.N.Y. 1997) (collecting cases), vacated on other grounds sub nom. Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998); see also Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A., 676 F.2d 47, 49 (2d Cir. 1982) (holding that

---

[25]Plaintiffs cite United States of Mexico v. Rask, 4 P.2d 981, 989 (Cal. Dist. Ct. App. 1931), which held that private attorneys could not assert a claim of immunity on behalf of a foreign sovereign. Even if Rask's reasoning survived the enactment of the FSIA, it does not apply here, where private attorneys attempted not to assert sovereign immunity, but to waive it. We see no inconsistency in restricting the methods by which a foreign country can claim sovereign immunity more tightly than the methods by which the country gives up that immunity. See Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd., 722 F. Supp. 1032, 1038 (S.D.N.Y. 1989) ("Congress . . . intended to restrict corporations and individuals more stringently from invoking the protective veil of sovereign immunity than it did to limit their ability to waive immunity on behalf of the government for whom they served as a private agent.").

explicit waiver must show "clear and unambiguous intent" to waive immunity). The first document stated that PNB waived immunity "pursuant to 28 U.S.C. § 1605(a)(1)," but that "[t]his waiver of immunity and consent to jurisdiction is made solely on behalf of Programa Nacional de Banano and shall not be deemed to be a waiver of any immunities, rights or defenses applicable to other governmental department[s] of the Republic of Ecuador or to the Republic of Ecuador itself."[26] Plaintiffs had presented evidence that because PNB was not a "juridical person" that could be sued under Ecuadorian law,[27] the Republic of Ecuador would be required to "consent[], by extension, to suit in PNB's behalf."[28] This waiver, limited to PNB, was not, therefore, "complete." Aguinda, 175 F.R.D. at 52. The second document stated that "[t]he Republic of Ecuador . . . ha[s] made it clear that any immunity from jurisdiction has been waived . . . . PNB hereby affirms that it is the intention of the Republic to waive sovereign immunity . . . ."[29] This statement is not a "clear, complete, unambiguous, and unmistakable" waiver. Aguinda, 175 F.R.D. at 52. Read literally, it does not purport to waive Ecuador's immunity, but merely states the PNB

---

[26]R2-14 at 3-4.

[27]May 31, 1995 Omnibus Order, R3-48 at 5.

[28]Id. at 6.

[29]R2-39 at 8.

27

lawyers' opinion that Ecuador either had filed an explicit waiver of immunity or planned to file one at some point. An express waiver of immunity must be more exact than this.[30]

B.    The June 1995 Terán Affidavit

The district court found that Ambassador Terán's June 1995 affidavit did not effect a valid waiver of sovereign immunity because its language was not sufficiently complete. After remanding the case, the court also suggested that it was not convinced that Terán had the authority to waive Ecuador's immunity before the courts of the United States. We disagree with both conclusions.

Terán stated that PNB and the Government of Ecuador waived PNB's immunity "[w]ithout waiving any other defense of law or fact to the claims asserted against it . . . for the purposes of these litigations only and in connection with the pending forum non conveniens motions."[31] The district court found that Terán's language was "expressly limited to litigation of the forum non conveniens motion now pending."[32] This holding was error; although Terán could have chosen his words more carefully,

---

[30]Plaintiffs also claim that these waivers were invalid because PNB had not hired the attorneys who filed the statements. Because we hold that the waivers were insufficient on other grounds, we need not reach this argument.

[31]R3-64 Attach., at 1, ¶ 3.

[32]R5-97 at 3.

28

the affidavit waives immunity completely and unambiguously, if somewhat awkwardly. The word "only," in the phrase "for the purposes of these litigations only and in connection with the pending forum non conveniens motions," modifies the expression "these litigations," but not the words "in connection." Although we rely on Terán's June 1995 affidavit to find a waiver of sovereign immunity, we note that his August 1995 affidavit, which states that he intended his earlier affidavit to "waive the immunity of the Republic with respect to the third, fourth and fifth party claims against PNB,"[33] confirms our understanding of the June 1995 waiver.

Terán's phrase "in connection with the pending forum non conveniens motions," which the district court read as a limitation on the waiver of immunity, actually shed light on his reasons for filing the waiver. Terán's affidavit went on to explain that the Republic of Ecuador believed that the cases should be litigated in Ecuador. The affidavit urged the court to dismiss the actions on the ground of forum non conveniens, suggesting that Terán's purpose was to keep the case in federal court, where a forum non conveniens dismissal might be more likely. The fact that the waiver may have been a tactical move does not alter our analysis. Nothing in the FSIA prohibits a foreign sovereign from effecting a waiver of immunity for strategic purposes. The courts need not approve the reasons underlying a foreign state's waiver

---

[33]R5-99 Attach., at 1.

of its immunity; indeed, to second-guess motivations and litigation strategy might signal a disrespect for a sovereign's autonomy that is at odds with the policies underlying the FSIA.

The district court stated that one of the reasons for its finding that Terán had not explicitly waived sovereign immunity was that "little evidence existed to prove who in the Republic of Ecuador . . . had the authority to waive immunity."[34] To reach this conclusion, the court conducted an inquiry into the law of Ecuador, attempting to "become informed of the relevant provisions of Ecuadoran law [and] determine precisely what is required for an effective waiver of sovereign immunity under that law."[35] Although we commend this diligent effort to resolve the waiver issue correctly, we conclude that the district court should have accepted Terán's authority to waive sovereign immunity on behalf of Ecuador.

Neither the FSIA nor its legislative history clearly states whether federal or state law controls questions relating to the authority of a person who purports to waive the immunity of a foreign sovereign under the FSIA. Because the FSIA "was not intended to affect the substantive law determining the liability of a foreign state or instrumentality," First Nat'l City Bank v. Banco Para el Comercio Exterior, 462 U.S.

---

[34]Oct. 12, 1995 Order, R6-113 at 2.

[35]Order Directing Parties to Supplement R., R4-74 at 1.

611, 620, 103 S. Ct. 2591, 2597 (1983), "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances," id. at 622 n.11, 103 S. Ct. at 2598 n.11. The effectiveness of an express or implied waiver under section 1605(a)(1) is not a question of liability, however, and therefore is governed by a uniform federal rule. "When it enacted the FSIA, Congress expressly acknowledged 'the importance of developing a uniform body of law' concerning the amenability of a foreign sovereign to suit in the United States Courts." Id., 103 S. Ct. at 2598 n.11. Just as federal courts apply a federal standard to determinations of the scope of an express waiver, see Hercaire, 821 F.2d at 563-65, and of the existence of an implied waiver, see Cabiri v. Republic of Ghana, 165 F.3d 193, 201-03 (2d Cir. 1999), petition for cert. filed (U.S. Apr. 26, 1999) (No. 98-4722), we apply federal law to the question of whether a waiver has been effected by one with the authority to do so.[36]

---

[36] Although some courts have applied state law when addressing whether an exception to sovereign immunity exists under the FSIA, their inquiries usually involve the commercial activities exception set forth in section 1605(a)(2) or the tortious activities exception set forth in section 1605(a)(5). See, e.g., Randolph v. Budget Rent-A-Car, 97 F.3d 319, 325 (9th Cir. 1996) (applying forum state's law to determine whether alleged tortfeasor was employee of foreign sovereign whose activities therefore fell within section 1605(a)(5)); First Fidelity Bank, N.A., v. Antigua & Barbuda—Permanent Mission, 877 F.2d 189, 194-96 & n.3 (2d Cir. 1989) (assuming without deciding that state law applies to determination of whether ambassador's borrowing of money constituted Antigua's commercial activity, as well as to waiver inquiry). But see Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 452 (D.C. Cir. 1990) (applying federal law to commercial activities exception inquiry). To determine the applicability of one of these exceptions, a court must grapple with the substantive question of whether the foreign sovereign is liable for the actions of its agent: "the court must answer the initial question

Our interpretation of the FSIA, the Congressional policies underlying that statute, and other concerns that arise in cases relating to foreign affairs lead us to conclude that when, as here, a duly accredited[37] head of a diplomatic mission (such as an ambassador)[38] files a waiver of his or her sovereign's immunity in a judicial proceeding, the court should assume that the sovereign has authorized the waiver absent extraordinary circumstances.

We may look to international law as a guide to the meaning of the FSIA's provisions. We find the FSIA particularly amenable to interpretation in light of the law of nations for two reasons. First, Congress intended international law to inform the courts in their reading of the statute's provisions. Prior to enactment of the FSIA, the U.S. State Department usually determined whether a foreign sovereign would be immune from suit in a U.S. court. See Verlinden, 461 U.S. at 486-87, 103 S. Ct. at 1968. State Department policy on sovereign immunity generally reflected customary

---

regarding the attribution of liability before it can find that it has subject matter jurisdiction over the foreign state pursuant to the FSIA." Sandra Engle, Note, Choosing Law for Attributing Liability Under the Foreign Sovereign Immunities Act:  A Proposal for Uniformity, 15 Fordham Int'l L.J. 1060, 1076 (1992).  A section 1605(a)(1) waiver inquiry, on the other hand, does not require the court to determine the extent or existence of the sovereign's liability; the court need only decide the preliminary question of whether the sovereign is amenable to suit.  Cases applying state law to the commercial activities and tortious activities exceptions therefore do not apply to the issue before us.

[37]No party contends that Terán was not duly accredited.

[38]We use the terms "ambassador" and "diplomatic representative" interchangeably.

32

international law.  See Stephens v. National Distillers and Chem. Corp., 69 F.3d 1226, 1233 (2d Cir. 1995).  The passage of the FSIA did not extinguish international law's relevance to sovereign immunity inquiries in the United States:

> The FSIA was enacted not so much to change the rules as to "transfer the determination of sovereign immunity from the executive branch to the judicial branch . . . ."  In transferring this responsibility, the FSIA was primarily codifying pre-existing international and federal common law.

Id. at 1234 (quoting H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6606).  Congress, therefore, indicated that courts should look to international law when interpreting the FSIA's terms.  See H.R. Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 (noting that FSIA "would codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law"); id. at 14, 1976 U.S.C.C.A.N. at 6613 ("[T]he central premise of the bill [is that] decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law."); see also In re Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493, 497-98 (9th Cir. 1992) ("Congress intended the FSIA to be consistent with international law . . . ."); West v. Multibanco Comermex, S.A., 807 F.2d 820, 831 n.10 (9th Cir. 1987) ("It is appropriate to look to international law when determining whether [an action] constitutes a 'taking' for purposes of FSIA."); Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d

33

300, 310 (2d Cir. 1981) ("[T]he [FSIA's] drafters seem to have intended rather generally to bring American sovereign immunity practice into line with that of other nations.").

Second, the FSIA's purposes included "promot[ing] harmonious international relations," Peré v. Nuovo Pignone, Inc., 150 F.3d 477, 480 (5th Cir. 1998), cert. denied, __ U.S. __, 119 S. Ct. 1033 (1999), and according foreign sovereigns treatment in U.S. courts that is similar to the treatment the United States would prefer to receive in foreign courts, see Williams v. Shipping Corp. of India, 489 F. Supp. 526, 528 (E.D. Va. 1980), aff'd, 653 F.2d 875 (4th Cir. 1981) ("In effect, a foreign nation is being accorded the . . . type of reciprocal immunity we would like to be accorded in a foreign court."); cf. H.R. Rep. No. 94-1487, at 29-30 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6628-29 (noting that goal of an FSIA provision is to prevent unfavorable treatment of U.S. corporations in courts abroad). We give effect to these Congressional purposes by considering the potential impact of our FSIA interpretations on foreign litigation involving the United States and its interests. See Persinger v. Islamic Republic of Iran, 729 F.2d 835, 841 (D.C. Cir. 1984) ("[S]ince some foreign states base their sovereign immunity decisions on reciprocity, or parity of reasoning, it is possible that a decision to exercise jurisdiction in this case would subject the United States to suits abroad . . . ."). Therefore, we interpret the issue

34

before us in light of customary international law, which generally is accepted abroad and is more easily ascertainable than divergent local laws.[39]

We look to a number of sources to ascertain principles of international law, including international conventions, international customs, treaties, and judicial decisions rendered in this and other countries. See Malcolm N. Shaw, International Law 59 (1991) (citing article 38(1) of the Statute of the International Court of Justice); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 715 (9th Cir. 1992) ("[I]n ascertaining and administering customary international law, courts should resort to 'the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators.'") (quoting The Paquete Habana, 175 U.S. 677, 700, 20 S. Ct. 290, 299 (1900)). These sources show that a sovereign's chief diplomatic representative to a foreign nation possesses an extraordinary role and powers. "[P]eoples of all nations from ancient times have recognized the status of diplomatic agents." Vienna Convention on Diplomatic Relations, Apr. 18, 1961, preamble, 23 U.S.T. 3227, 500 U.N.T.S. 95. The ambassador performs several important functions on behalf of the state that has sent him or her to another country, including

---

[39]Referring to international law addresses the concerns of the district judge, who suggested at an evidentiary hearing that applying U.S. law to the waivers of a foreign sovereign's agent might encourage foreign sovereigns to apply their own law to determine which representatives of the United States were entitled to waive this country's sovereign immunity. See Tr. of June 26, 1995, Hr'g, R7 at 39-40, 45-47.

"representing the sending State in the receiving State[,] protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law," id. art. 3, and "act[ing] as representative of the sending State to any international organization," id. art. 5(3).

Under international law, ambassadors have broad powers to bind the countries they represent. "In virtue of their functions and without having to produce full powers, the following are considered as representing their State: . . . (b) heads of diplomatic missions, for the purpose of adopting the text of a treaty between the accrediting State and the State to which they are accredited . . . ." Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, art. 7(2), 1155 U.N.T.S. 331;[40] see also Restatement (Third) of the Foreign Relations Law of the United States § 311 cmt. b (1986). Some countries have codified a rule that a diplomatic representative always has authority to waive sovereign immunity on behalf of his or her sovereign. See, e.g., Foreign Sovereign Immunities Act, 1985, ch. 31(5) (Austl.) ("In addition to any other person who has authority to waive [immunity] on behalf of a foreign State . . . the person for the time being performing the functions of the head

---

[40]"Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties." Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 638 n.9 (5th Cir. 1994) (citing Restatement (Third) of the Foreign Relations Law of the United States pt. III, Introductory Note (1986)).

of the State's diplomatic mission in Australia has that authority."); State Immunity

Act, 1978, § 2(7) (U.K.) (same).

International courts traditionally have assumed that an ambassador's powers include the authority to present his or her country's position before foreign tribunals. A country's diplomatic representative may, for example, sign an application to initiate proceedings before the International Court of Justice on the country's behalf; unlike other agents, the diplomatic representative does not need to authenticate his or her signature. See I.C.J. Rules of Court, art. 38 ("If the application bears the signature of someone other than [the] diplomatic representative [to the forum country], the signature must be authenticated by the latter or by the competent authority of the applicant's foreign ministry."). The United Nation's International Law Commission has explained that courts should assume the authority of an ambassador to effect a waiver of diplomatic immunity.[41]

> In [a draft of the waiver provision of the Vienna Convention on Diplomatic Relations], paragraph 2 read as follows: "In criminal proceedings, waiver must always be effected expressly by the Government of the sending State." The Commission decided to delete the phrase "by the Government of the sending State", because it was

---

[41]Diplomatic immunity, like sovereign immunity, belongs to the foreign state and may only be waived by the state itself. Compare FSIA, 28 U.S.C. § 1605(a) ("A foreign state shall not be immune . . . in any case . . . in which the foreign state has waived its immunity . . . .") with Vienna Convention on Diplomatic Relations, Apr. 18, 1961, art. 32(1), 23 U.S.T. 3227, 500 U.N.T.S. 95 ("The immunity from jurisdiction of diplomatic agents . . . may be waived by the sending State.").

open to the misinterpretation that the communication of the waiver should actually emanate from the Government of the sending State. As was pointed out, however, <u>the head of the mission is the representative of his Government, and when he communicates a waiver of immunity the courts of the receiving State must accept it as a declaration of the Government of the sending State.</u> In the new text, the question of the authority of the head of the mission to make the declaration is not dealt with, <u>for this is an internal question of concern only to the sending State and to the head of the mission</u>.

<u>Commentary of the U.N. International Law Commission</u>, [1958] 2 Y.B. Int'l L. Comm'n 78, 99, <u>reprinted in</u> 7 Whiteman <u>Digest</u> § 43, at 422 (emphasis added).

The opinions of our own courts similarly reflect the presumption that an ambassador has authority to represent his or her state in legal proceedings.

It has been recognized that diplomatic agents of one state, while in another, may commence and maintain actions on behalf of their state while they are recognized as such. . . . Proof of the agency or of the diplomat is dependent entirely upon the political fact of the recognition by the political department of the government.

<u>Lehigh Valley R.R. Co. v. State of Russia</u>, 21 F.2d 396, 400 (2d Cir. 1927) (citation omitted); <u>cf. also</u> <u>The Sao Vicente</u>, 260 U.S. 151, 154-55, 43 S. Ct. 15, 16 (1922); <u>The Anne</u>, 16 U.S. (3 Wheat.) 435, 445-46 (1818) (citing international law); <u>Jota</u>, 157 F.3d at 162-63 (noting "the traditional authority of ambassadors to represent the state's position before foreign courts"); <u>Agency of Canadian Car & Foundry Co. v. American Can Co.</u>, 258 F. 363, 368-69 (2d Cir. 1919) (holding that certificate of Russian ambassador "must be regarded . . . as an authoritative representation by the Russian

38

government . . . and as such binding and conclusive in the courts of the United States against that government") (citing international law); cf. Gerritsen v. Escobar y Cordova, 688 F. Supp. 556, 558 (C.D. Cal. 1988) ("It has long been the practice in the federal courts that ambassadors may represent their states in claims against them."). This authority includes the power to assert sovereign immunity, see, e.g., Compania Espanola de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 74-75, 58 S. Ct. 432, 435 (1938) (holding that ambassador's application to claim immunity of vessel from suit "was properly entertained by the District Court"), and, it follows, to waive it, see Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd., 722 F. Supp. 1032, 1038 (S.D.N.Y. 1989) (noting Congressional intent to restrict invocations of sovereign immunity more tightly than waivers); cf. Fatemi v. United States, 192 A.2d 525, 528 (D.C. Ct. App. 1963) (holding that "[f]rom the point of view of the police and the courts of the United States, the country to which he is accredited," the actions of a minister of the Iranian Embassy who purported to waive the Embassy's inviolability by asking local police to enter the Embassy and arrest trespassers "must be regarded as legal").

The U.S., foreign and international courts' custom of presuming that an ambassador has authority to speak for his or her country probably stems from practical needs. A state's embassy ordinarily is more accessible than members of its

39

home government to litigants and courts in a forum state.  Perhaps for this reason, the transmission of a state's decision whether to invoke or claim immunity is one of the traditional functions of an embassy.

> Waivers of diplomatic immunity have been accomplished in a variety of ways . . . . [W]aivers of immunity have been formally communicated by the Ambassador of the mission concerned to the Department of State. . . . In U.S. practice, waivers of immunity are only made by the chiefs of mission of our diplomatic missions abroad, pursuant to an authorization from the Department of State.

Vienna Convention on Diplomatic Relations:  Hearing Before the Subcomm. of the Senate Comm. on Foreign Relations, 89th Cong. 75 (1965) (questions and answers supplied by the State Department); see Sea Hunt, Inc. v. Unidentified, Shipwrecked, Vessel or Vessels, 22 F. Supp. 2d 521, 524 (E.D. Va. 1998) (noting that historically, ambassadors could appear before U.S. courts to claim sovereign immunity).

We find additional support for our holding that a court usually should accept an ambassador's authority to waive immunity in the Congressional intent underlying the FSIA.  Responding to problems created by the political nature of sovereign immunity inquiries, Congress passed the FSIA in order to create uniform and predictable standards for litigation involving foreign governments.  See Verlinden, 461 U.S. at 488, 103 S. Ct. at 1968 (stating that FSIA was passed "in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to assure litigants that decisions are made on purely legal grounds and

40

under procedures that insure due process") (internal quotation and punctuation omitted); In re Air Crash Disaster Near Roselawn, 96 F.3d 932, 937 (7th Cir. 1996). The statutory scheme benefits foreign sovereigns by giving them notice of when they will be subject to the jurisdiction of the U.S. courts and by allowing them to elect to litigate in the United States by effecting a waiver under section 1605(a)(1). It likewise benefits those who do business with foreign sovereigns by providing predictable and uniform methods for establishing jurisdiction in the event of a dispute.

Requiring the courts to look to a sovereign's local law to determine the authority of any agent who purports to waive sovereign immunity, even if that agent is an ambassador, would hinder the goals of the FSIA and its waiver provision. Such a rule at best would create a roadblock to all FSIA actions, requiring lengthy, unpredictable, and frequently inconclusive inquiries into conflicting interpretations of foreign law (such as that undertaken by the district court in this action). At worst, both foreign sovereigns and the parties involved in litigation with them could abuse such a rule. The foreign state would have "the opportunity of raising immunity perhaps even after it has unsuccessfully defended on the merits." George Kahale III, State Loan Transactions: Foreign Law Restrictions on Waivers of Immunity and Submissions to Jurisdiction, 37 Bus. Law. 1549, 1561 n.70 (1982). Thus, it could "reap the benefits of our courts while avoiding the obligations of international law."

41

First Nat'l City Bank, 462 U.S. at 634, 103 S. Ct. at 2603. When a foreign state wishes to participate in a lawsuit and agrees to do so by explicit or implicit waiver, on the other hand, a party opposed to its presence might be able to persuade a court to "deny it the opportunity to appear and defend on the ground that it is prohibited from doing so under its own law." Kahale, State Loan Transactions, 37 Bus. Law. at 1561 n.70. Both results would undercut the utility of the waiver provision of the FSIA. Finally, a rule that a court always must investigate an agent's authority to waive immunity would increase the number of "potentially intrusive and resented inquiries of foreign governments." First Fidelity Bank, N.A., v. Antigua & Barbuda—Permanent Mission, 877 F.2d 189, 199 (2d Cir. 1989) (Newman, J., dissenting).

Other concerns, uniquely related to the courts' role in the sensitive area of international relations, mitigate against questioning an ambassador's representations on behalf of his or her country before the courts. A judicial inquiry into a foreign ambassador's authority to perform traditional diplomatic functions can infringe upon the authority of our own executive and legislative branches to manage the foreign relations of the United States.

> Who is the sovereign . . . of a country is a question for the political departments of the government. It is not a judicial question. . . . In the same way the question who represents and acts for a foreign sovereign or nation in its relations with the United States is determined, not by the

> judicial department, but exclusively by the political branch of the government.

Agency of Canadian Car, 258 F. at 368.  See also Lehigh Valley, 21 F.2d at 399-400; Republic of China v. Pang-Tsu Mow, 101 F. Supp. 646, 649 (D.D.C. 1951), aff'd in part, appeal dismissed in part, 201 F.2d 195 (D.C. Cir. 1952) ("This Court cannot entertain the statement of a citizen of a foreign country . . . that the ambassador is not authorized to act as he has when the State Department has certified that person, as the recognized ambassador to this country.").  Under certain circumstances, a foray into foreign law to determine whether a diplomatic representative has acted in accordance with its dictates also could implicate the act of state doctrine, which "limits, for prudential rather than jurisdictional reasons, the courts in this country from inquiring into the validity of a recognized foreign sovereign's public acts committed within its own territory."  Honduras Aircraft Registry, 129 F.3d at 550 (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S. Ct. 923, 926 (1964)).

We do not hold that the courts should deem an ambassador to be authorized to waive a sovereign's immunity under all circumstances; an ambassador may so clearly lack authority that his or her representations to a court do not bind the sovereign.  In First Fidelity, 877 F.2d at 191, the Second Circuit held that a loan agreement and consent order executed by an ambassador to the United Nations would be effective only if the ambassador "possessed the apparent authority to borrow the money and to

43

waive Antigua's sovereign immunity." Id. at 193.[42] Our review of international law supports the conclusion that an ambassador's statements may so plainly contradict the position of his sovereign that they do not bind the sovereign. In Legal Status of Eastern Greenland (Den. v. Nor.), 1933 P.C.I.J. (ser. A/B) No. 43, at 54-64 (April 5, 1933), the Permanent Court of International Justice held that the fact that a few Danish diplomats used a certain term when negotiating a territorial dispute did not bind Denmark to that term, because "the relevant correspondence as a whole showed that in fact the Danish Government adopted uniformly the [contrary] view." 6 Lauterpacht Digest at 102 (analyzing Eastern Greenland). See also Restatement (Third) of Foreign Relations § 311, reporters' note 4 (stating that in the context of international agreements, "a state is bound by apparent authority where lack of authority is not obvious to outside parties"). Accordingly, we hold that, under the FSIA, courts should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it "obvious" that he or she does not.

---

[42]We, unlike the First Fidelity court, do not conduct a traditional apparent authority inquiry because a finding of apparent authority requires reliance, which will rarely exist when a court first considers an explicit waiver made in the course of judicial proceedings. See Restatement (Second) of Agency § 8 cmt. d (1958). Although the First Fidelity court analyzed the waiver under state agency law, rather than the federal and international law principles that we discuss above, the rule it arrived at parallels ours: courts should accept ambassadors' authority absent "obvious" evidence that they lack it. First Fidelity, 877 F.2d at 192.

We see no evidence in this action making it "obvious" that Terán lacked authority to waive Ecuador's sovereign immunity. First, filing a court document on Ecuador's behalf was the type of task a diplomat traditionally performs on behalf of his nation, rather than a commercial transaction that Terán might have entered for his own purposes. The nature of Terán's activities distinguishes these cases from First Fidelity, in which an ambassador borrowed funds (ostensibly to pay for renovations to Antigua's U.S. property), invested them in a casino, ceased loan payments, and finally signed a consent order purporting to waive Antigua's sovereign immunity. See 877 F.2d at 191. The First Fidelity court directed the trial court to examine the circumstances surrounding the transaction to determine whether the ambassador acted with apparent authority. One important factor in this inquiry, the court suggested, was the commercial nature of the transaction. It noted that the context of "[i]nternational agreements," which involved "considerably more dignity than [the ambassador's] purely commercial transactions with First Fidelity," might be more likely to suggest apparent authority. 877 F.2d at 192.

Second, the affidavits and letters that plaintiffs produced did not make it "obvious" that Terán lacked authority to effectuate the waiver. None of these documents alleged that Terán was not an accredited representative of Ecuador or that he lacked authority to act on behalf of Ecuador under other circumstances. Indeed,

45

Ecuador's highest elected official, President Durán Ballén, filed an affidavit stating that Terán had been authorized to act as he did.   Plaintiffs countered with experts' opinions stating that no Ecuadorian government official had the legal authority to waive sovereign immunity.   We do not find the legal authorities plaintiffs cite particularly convincing, especially in light of the fact that several U.S. courts have noted Ecuador's waiver of sovereign immunity in other transactions. See, e.g., Ortega Trujillo v. Banco Central, 17 F. Supp. 2d 1340, 1343 n.2 (S.D. Fla. 1998); Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador, 823 F. Supp. 1106, 1109 (S.D.N.Y. 1993).

Plaintiffs also alleged that under the Ecuadorian Constitution, only the Attorney General was authorized to act in judicial matters; they presented an affidavit of the Attorney General stating that he had not authorized Terán to waive immunity. Coincidentally, in Jota, an unrelated case, the Second Circuit recently rejected a similar argument relating to representations made by Ambassador Terán.

> An ambassador generally has the power to "bind the state that he represents," unless he purports to enter into an agreement without the power to do so and in collusion with a contracting party that knows he lacks such power.   To this point, the Republic responds that under Ecuadoran law, only the Attorney General is authorized to make representations on behalf of the Republic in a judicial proceeding. See Ecuador Const. art. 139 ("The Attorney General will be the only judicial representative of the State . . . .").   However, the quoted language seems best understood to make the Attorney General the sole representative of the state before the Ecuadoran judiciary, without disturbing the

46

traditional authority of ambassadors to represent the state's position before foreign courts.

Jota, 157 F.3d at 162-63 (citations omitted). In sum, plaintiffs' evidence regarding Terán's authority was inconclusive. This evidence did not make any lack of authority obvious enough to override the presumption that Terán acted on behalf of Ecuador. The district court therefore should have accepted jurisdiction over PNB.

Because we hold that Ambassador Terán's June 1995 waiver of Ecuador's sovereign immunity was complete and effective, we do not reach the question of whether Terán's August 1995 affidavit also effected a waiver.

CONCLUSION

For the foregoing reasons, we REVERSE the order of the district court dismissing PNB, VACATE the order of the district court remanding the case to state court, REMAND to the district court for further proceedings in accordance with this opinion, and DENY plaintiffs' Motion for Attorneys' Fees and Costs.

47